[No. 34451. *En Banc.* January 29, 1959.]

HOWARD L. NOSTRAND *et al., Respondents,* v. THOMAS BALMER *et al., Appellants.*[1]

[1]Reported in 335 P. (2d) 10.

462

*The Attorney General* and *Michael R. Alfieri, Assistant,* for appellants.

*Solie M. Ringold* and *Francis Hoague,* for respondents.

DONWORTH, J.—This action was commenced by two professors (respondents), employed by the state of Washington to teach at the University of Washington for the purpose of obtaining a declaratory judgment[2] adjudicating Laws of

---

[2]Pursuant to the provisions of RCW 7.24.010, *et seq.*

1955, chapter 377, p. 1545,[3] to be violative of several provisions of the constitutions of the United States and of this state, and seeking a permanent injunction enjoining the enforcement thereof.

In their complaint, respondents alleged their employment under contract as professors of the University of Washington; that appellants (the university board of regents, president, and vice-president, and the state attorney general) are charged with "the duty of establishing, enforcing, carrying out and administering the provisions of . . . the Act"; that appellants have demanded that respondents sign and swear to an oath; that, unless respondents comply with such demands, their employment contracts with the university will be terminated by appellants; that, unless appellants be restrained from enforcing the act and insisting upon the execution of the oath, respondents will suffer irreparable injury not compensable in monetary damages; and that respondents have no adequate remedy at law.

In so far as is presently material, the affidavit which appellants demanded that respondents subscribe, upon oath, recites above the jurat and place provided for signature:

"(2) That I am not a subversive person or a member of the Communist Party or any subversive organization, foreign or otherwise, which engages in or advocates, abets, advises, or teaches the overthrow, destruction or alteration of the constitutional form of the government of the United States, or of the State of Washington, or of any political subdivision of either of them, by revolution, force or violence;

"That this statement is voluntarily made by me, pursuant to the provisions of Chapter 377, Laws of 1955, with full knowledge that the same is subject to the penalties of perjury."

Prior to trial, respondents requested, in writing, and obtained certain admissions of fact. Other facts which respondents requested appellants to admit were denied. The

---

[3] This act consists of four sections, the first two of which are amendatory of provisions initially enacted in the subversive activities act, Laws of 1951, chapter 254, p. 793, and the last two of which are entirely new legislation.

record before us does not reveal what disposition, if any, the trial judge made of these disputed factual matters.

Trial to the court resulted in the entry of findings of fact (substantially in accord with the averments contained in the complaint), conclusions of law, and a final decree holding the entire act of 1955 to be violative of the constitution of this state, and permanently restraining appellants from administering and enforcing any of the provisions therein contained.[4] This appeal followed.

Before considering the respective contentions advanced by the parties, and because chapter 377, Laws of 1955, is amendatory legislation, it is necessary, in order to place it in its proper perspective, to analyze the act amended thereby, i.e., the subversive activities act of 1951,[5] and to consider its background and legislative history.

The 1951 act was a comprehensive statute enacted by the legislature pursuant to executive request and as a result of the report of the joint fact-finding committe on un-American activities in the state of Washington (otherwise referred to as the Canwell committee). This committee was created by house concurrent resolution No. 10,[6] adopted by the legislature at its 1947 session, and was directed to investigate subversive activities in the state of Washington and to file a report with the thirty-first (1949) legislature.

---

[4]The material portions of the final decree read as follows:

"It Is HEREBY ORDERED, ADJUDGED AND DECREED that Chapter 377, Laws of 1955 violates the Constitution of the State of Washington, and is therefore void and of no effect; and

"It Is FURTHER ORDERED, ADJUDGED AND DECREED that the above-named defendants [appellants] be and they are hereby permanently restrained from establishing, enforcing, carrying out, and administering the provisions of Chapter 377, Laws of 1955 and from requiring the plaintiffs [respondents] to execute any oath pursuant to said Chapter."

[5]Chapter 254, Laws of 1951, p. 793.

[6]Laws of 1947, p. 1378. Pertinent provisions of this resolution are quoted at length in appendix A. The complete text of house concurrent resolution No. 10 may also be found in State ex rel. Robinson v. Fluent, 30 Wn. (2d) 194, 191 P. (2d) 241 (1948) (cert. den., 355 U. S. 844, 93 L. Ed. 394, 69 S. Ct. 66), wherein we upheld the validity of this resolution.

Acting pursuant to authority vested in it by this resolution, the committee conducted its investigation and held extensive public hearings in 1948.[7] As directed, the committee reported its findings, conclusions, and recommendations to the legislature at its 1949 session.[8]

After receiving and considering the committee's report, the thirty-first (1949) legislature adopted, as part of its general appropriations act, a proviso[9] (similar to that adopted by the 1947 legislature)[10] designed to prevent public funds from reaching public employees who advocated, or who were members of organizations that advocated, the overthrow of the government of the United States by force or violence.

In his message to the thirty-second legislature at the commencement of its regular session in January, 1951, the

---

[7]Other litigation resulted from these hearings, notably *State v. James,* 36 Wn. (2d) 882, 221 P. (2d) 482; 341 U. S. 911, 95 L. Ed. 1348, 71 S. Ct. 615 (cert. den.); 341 U. S. 937, 95 L. Ed. 1365, 71 S. Ct. 851 (rehearing den.). The defendant therein was charged, tried and convicted for willfully refusing to answer a proper and material question put to him by the committee after being duly summoned to give testimony. In rejecting appellant's attack upon the constitutionality of house concurrent resolution No. 10, we adhered to our prior decision in *State ex rel. Robinson v. Fluent, supra.* Other cases involving witnesses before the committee who were similarly charged, tried, and convicted, were consolidated on appeal to this court: *State v. Gundlach, State v. Forschmiedt, State v. Ottenheimer, State v. James,* 36 Wn. (2d) 918, 221 P. (2d) 502; cert. den. in *Forschmiedt* and *James* cases; 341 U. S. 910, 95 L. Ed. 1347, 71 S. Ct. 615, rehearing den. 341 U. S. 937, 95 L. Ed. 1365, 71 S. Ct. 851.

[8]House Journal of the thirty-first legislature of the state of Washington (1949), p. 1095. This report incorporated by reference two prior reports (First Report, Un-American Activities in Washington State, 1948, and Second Report, Un-American Activities in Washington State, 1948) of the committee which contained testimony adduced at its hearings, together with findings and conclusions drawn by the committee from that testimony which appears as prefatory remarks therein. Pertinent excerpts from the committee's final report to the legislature, including the committee's conclusions prefacing these prior reports, are set out in appendix B.

[9]Laws of 1949, chapter 242, § 2, p. 948, thereof provided, in part: ". . . That no part of any appropriation contained in this act shall be used to pay the salary or wages of any person who . . . advocates, or is a member of an organization that advocates, the overthrow of the government of the United States by force or violence. . . ."

[10]Laws of 1947, chapter 287, § 2, p. 1334.

governor pointed out the national emergency then existing, its causes and potential effects, and the strategic geographical position of the state of Washington in any such emergency.[11] He further urged that appropriate legislation be immediately enacted in order to curb subversive activities in this state, particularly in view of the then existing national emergency and the disclosures made through the efforts of the joint fact-finding committee on un-American activities (Canwell committee) created by house concurrent resolution No. 10.[12]

The subversive activities act originally passed by the legislature in 1951 consisted of twenty-two sections. Five

[11]House Journal of the thirty-second legislature of the state of Washington (1951), p. 23:

"Again we meet in a time of great national emergency.

"All of us had fervently hoped for a long respite from the waste and sacrifice of war and preparation for war. Our country had placed chief reliance in the United Nations to maintain world peace and order. We had disbanded our armies, decommissioned our fleets of ships and planes, dismantled our war plants, and turned our attention to the pressing problems of our civilian economy.

"But the evil menace of expanding communism would not have it so. While the rest of the world pursued a peaceful path, the forces of communism, bent upon a wholly different course, were gathering vast strength and power. Their method was regimentation, suppression, infiltration, intimidation and aggression. Their purpose was to push the frontiers of that ideology so deeply into the territory and institutions of free nations, that all the world would fall an easy prey. Then came the day when the principles and authority of the United Nations were openly defied in the halls at Lake Success, and physically challenged on the Korean fields of battle.

"This nation and the world are now awake to the danger. We still hope to avert World War III. But it is so perilously close that our nation has already come virtually to a war footing. This is bringing with it a fundamental change in our civilian economy, with resulting burdens and sacrifices for all of us. If the emergency becomes more acute, developing into a global war, we all face the risk of great loss and suffering. We face these possibilities, not cheerfully, but with the determination to do what must be done to preserve, for our children, the way of life all of us so deeply cherish.

"It is in this setting that the Thirty-second Legislature of the State of Washington meets to discharge its legislative duties.

"Our state occupies a position of great importance in this emergency, as it did throughout World War II. It is a tremendous arsenal for military might. Its strategic geographical location, moreover, has special military significance in any war with communism. . . . ."

468

of these. (§§ 6, 7, 8, 10, and 21), containing administrative provisions, were vetoed by the governor.[13] The remaining seventeen sections became effective on March 19, 1951, upon executive approval.[14] Each of these sections falls into one of three general classifications: penal, administrative, or regulatory.

Sections eleven, twelve, thirteen, fourteen and seventeen bear directly upon the problem before us and are set out in the margin.[15] These sections impose conditions upon eligi-

[12]*Ibid.* p. 30:

"To further strengthen our civil defense program, we also must be mindful of that small group of traitors within our citizenry who would destroy our freedom from within. In this connection I strongly urge that the legislature give thought to enactment of appropriate provisions for the curbing of subversive activity, and to protect our free institutions from perversion into weapons of aggression against us in the hands of our enemies.

"By Concurrent Resolution No. 10, the Thirtieth Legislature created the Joint Legislative Fact Finding Committee on Un-American Activities. Through the labors of this committee much was learned of the degree to which disloyal groups had infiltrated into organizations of our senior citizens, into various economic and educational groups. As the result of these disclosures, some remedial action was taken but in the light of the grave emergency which we now face, additional action must be taken immediately. Therefore a bill is being prepared calculated to give support at the state level to the efforts of our various federal agencies charged with the responsibility of combating these forces of tyranny and enslavement. . . ."

[13]Laws of 1951, chapter 254, §§ 6, 7, and 8, pp. 797, 798, § 10, p. 798, § 21, p. 802. Senate Journal of the thirty-second legislature of the state of Washington, p. 842.

[14]Laws of 1951, chapter 254, § 22, p. 803.

[15]Laws of 1951, chapter 254:

"Sec. 11. No subversive person, as defined in this act, shall be eligible for employment in, or appointment to any office, or any position of trust or profit in the government, or in the administration of the business, of this state, or of any county, municipality, or other political subdivision of this state. (*cf.* RCW 9.81.060)

"Sec. 12. Every *person* and every *board, commission, council, department, court or other agency* of the state of Washington or any political subdivision thereof, who or which appoints or employs or supervises in any manner the appointment or employment of public officials or employees shall *establish by rules, regulations or otherwise, procedures designed to ascertain whether any person is a subversive person.* In securing any facts necessary to ascertain the information herein required, the applicant shall be required to sign a written statement containing answers to such inquiries as may be material, which statement

shall contain notice that it is subject to the penalties of perjury. (Italics ours.) (*cf.* RCW 9.81.070)

"Sec. 13. The inquiries prescribed in preceding sections, other than the written statement to be executed by an applicant for employment, shall not be required as a prerequisite to the employment of any persons in any case in which the employing authority may determine, and by rule or regulation specify the reasons why, the nature of the work to be performed is such that employment of such persons will not be dangerous to the health of the citizens or the security of the governments of the United States, the state of Washington, or any political subdivision thereof. (*cf.* RCW 9.81.080)

"Sec. 14. Every person who, on June 1, 1951, shall be in the employ of the state of Washington or of any political subdivision thereof, other than those now holding elective office shall be required on or before July 1, 1951, to make a written statement which shall contain notice that it is subject to the penalties of perjury, that he or she is not a subversive person as defined in this act; namely, any person who commits, attempts to commit, or aids in the commission, or advocates, abets, advises or teaches by any means any person to commit, attempt to commit, or aid in the commission of any act intended to overthrow, destroy or alter, or to assist in the overthrow, destruction or alteration of, the constitutional form of the government of the United States, or of the state of Washington, or any political subdivision of either of them, by revolution, force, or violence; or who is a member of a subversive organization or a foreign subversive organization, as more fully defined in this act. Such statements shall be prepared and execution required of and by every person and every board, commission, council, code department, court or other agency of the state of Washington or any subdivision thereof responsible for the supervision of other employees, for the employees under the jurisdiction thereof. Any such person failing or refusing to execute such a statement or who admits he is a subversive person as defined in this act shall immediately be discharged. . . .

"Sec. 17. Every written statement made pursuant to this act by an applicant for appointment or employment, or by any employee, shall be deemed to have been made under oath if it contains a declaration preceding the signature of the maker to the effect that it is made under the penalties of perjury. Any person who wilfully makes a material misstatement of fact (a) in any such written statement, or (b) in any affidavit made pursuant to the provisions of this act, or (c) under oath in any hearing conducted by any agency of the state, or of any of its political subdivisions pursuant to this act, or (d) in any written statement by an applicant for appointment or employment or by an employee in any state aid or private institution of learning in this state, intended to determine whether or not such applicant or employee is a subversive person as defined in this act, which statement contains notice that it is subject to the penalties of perjury, shall be subject to the penalties of perjury, as prescribed in chapter 9.72, R.C.W." (*cf.* RCW 9.81.110.)

bility for public employment in sensitive occupations and require that all such state employees, or applicants for state employment, take an oath, subject to the penalties of perjury, as a prerequisite of public employment or the continuance thereof.

The terms "subversive person," "subversive organization," and "foreign subversive organization" (used in these five sections) are particularly defined in section one of the act. The definition of "subversive person" was amended in 1953[16] to specifically provide that a person must have knowledge that an organization is a "subversive organization" or "foreign subversive organization" (as elsewhere defined in section one) before such person becoming or remaining a member thereof can be deemed to be a "subversive person." (This 1953 amendment is a complete answer to respondents' argument in their brief concerning the alleged lack of *scienter* as an essential element in this section.) Cf. *Wieman v. Updegraff*, 344 U. S. 183, 97 L. Ed. 216, 73 S. Ct. 215 (1952).

With this legislative history and background in mind, we now turn to the consideration of Laws of 1955, chapter 377, which was held by the trial court to be unconstitutional in its entirety. As previously stated, this act consists of only four sections, of which the first two purport to amend sections twelve and thirteen of the 1951 act (RCW 9.81.070 and .080), and the latter two purport to add new sections thereto (*cf.* RCW 9.81.082 and .083). These latter two sections will be considered in the order ruled upon by the trial court and discussed by the respective parties in their briefs.

Section three of the amendatory act provides:

"For the purpose of this act, membership in a subversive organization shall be membership in any organization after it has been placed on the list of organizations designated by the attorney general of the United States as being subversive pursuant to executive order No. 9835."

The trial court concluded that:

"Section 3 of chapter 377, Laws of 1955, constitutes an unconstitutional delegation of legislative authority to an

---

[16]Laws of 1953, chapter 142, p. 273.

officer of the United States over which the state government has no control and without adequate standards being set forth to guide such officer in the exercise of such delegation."

█ Appellants first assign error to this conclusion. They argue that section three was merely an adoption by our legislature of a factual determination made by a foreign administrative agency (U. S. attorney general). This argument is unappealing for at least three reasons:

(1) Executive order No. 9835, promulgated by the president of the United States on March 21, 1947 (5 U. S. C. A., § 631; 12 F. R. 1935; 3 C. F. R., 1943-1948 Comp., p. 627), was specifically revoked by executive order No. 10450 (5 U. S. C. A., § 631, 18 F. R. 2489; 3 C. F. R., 1953 Supp., p. 72), issued April 27, 1953 (almost two years prior to the enactment of § 3).

(2) The method followed by the attorney general for listing subversive organizations pursuant to executive order No. 9835 was held by the supreme court of the United States to be violative of the due process clause of the fifth amendment to the United States constitution in *Joint Anti-Fascist Refugee Committee v. McGrath,* 341 U. S. 123, 95 L. Ed. 817, 71 S. Ct. 624 (April 30, 1951), which was almost four years prior to the enactment of § 3.

(3) Section three purported to include "membership in any organization after it has been placed on the list of organizations designated by the attorney general of the United States as being subversive." This would include organizations listed by him *in futuro ad infinitum.* Statutes attempting to adopt by reference future Federal rules, regulations or statutes are unconstitutional. *State ex. rel. Kirschner v. Urquhart,* 50 Wn. (2d) 131, 310 P. (2d) 261 (1957).

Thus it is apparent that section three purported to adopt unconstitutional findings of the attorney general, promulgated pursuant to an executive order, which had been revoked and superseded long prior to the enactment of the 1955 act. We cannot, under the guise of judicial interpretation, interject executive order No. 10450 (and the due process

procedure provided for the listing of subversive organizations thereunder) into section three, contrary to the express terms thereof. This section is, therefore, unconstitutional and void. *State ex rel. Kirschner v. Urquhart, supra.* For these reasons, the result reached by the trial court is correct, and appellants' first assignment of error cannot be sustained.

Appellants next assign error to the trial court's conclusion that:

"Section 4 of chapter 377, Laws of 1955, amends § 1, chapter 254, Laws of 1951, in that it adds a new category of subversive organization and of subversive activity. This section, therefore, embraces subjects not set forth in the title to chapter 377, Laws of 1955, and is, therefore, unconstitutional."

(It must be noted that the court's reference in this conclusion to "§ 1, chapter 254, Laws of 1951" is inaccurate, in that it overlooks the fact that section one was previously amended by Laws of 1953, chapter 142, § 1, p. 273.)

Section four of the 1955 act provides:

"The communist party is a subversive organization within the purview of RCW 9.81 and membership in the communist party is a subversive activity thereunder."

Apparently, the above quoted conclusion of the trial court is based on Art. II, § 19, of the Washington constitution, requiring that:

"No bill shall embrace more than one subject, and that shall be expressed in the title."

If section four is in fact *amendatory* of a prior section of the subversive activities act, as the trial court concluded, it would also violate Art. II, § 37 of the Washington constitution, which provides:

"No act shall ever be revised or amended by mere reference to its title, but the act revised or the section amended shall be set forth at full length."

■ Respondents' argument is that section four amends the definition of "subversive organization" (Laws of 1953, chapter 142, § 1; RCW 9.81.010) by establishing conclusively

that the communist party is such an organization, thereby creating a "new and different crime" under Laws of 1951, chapter 254, § 3 (RCW 9.81.030). This contention is untenable.

Section four of the 1955 act is nothing more than the legislature's declaration of its recognition that the communist party falls within the definition of "subversive organization" contained in Laws of 1953, chapter 142, § 1. As such, it is supplementary rather than *amendatory*. Therefore, the sections of the act which it supplements need not be set out in full in order to satisfy the last mentioned constitutional requirement, because:

". . . If the amendatory act only adds a new section to the old act, only the new section need be set forth in the body of the amendatory act." 1 Sutherland, Statutory Construction (3d ed.), 407, § 1928.

See, also, *State v. Lawson*, 40 Wash. 455, 82 Pac. 750 (1905); *State ex. rel. Washington Toll Bridge Authority v. Yelle*, 32 Wn. (2d) 13, 200 P. (2d) 467 (1948); *Bellingham v. Hite*, 37 Wn. (2d) 652, 225 P. (2d) 895 (1950).

■ Laws of 1955, chapter 377, is entitled:

"An Act relating to subversive activities; requiring state, county and municipal employers to ask employees under oath concerning memberships in *the communist party or other subversive groups*; and amending . . ." (Italics ours.)

The single subject of the entire act, "subversive activities," is "expressed in the title" as required by Art. II, § 19, of the state constitution. That part of the title above italicized characterized the communist party as a "subversive group" and gives sufficient notice of the contents of section four.

We are of the opinion that the title of the 1955 act does not violate either of the constitutional provisions above discussed and that the trial court's conclusion, holding to the contrary, is erroneous.

Error is next assigned to the trial court's conclusion that:

"Chapter 377, Laws of 1955, is unconstitutional in its entirety . . . because . . . §§ 3 and 4 of the chapter are not separable from the first two sections."

■ In *In re Hendrickson*, 12 Wn. (2d) 600, 123 P. (2d) 322 (1942), we recognized that the ultimate test of separability is the intention of the legislature, as determined by the court, and restated the rule to be:

". . . that the entire statute will fall where the constitutional and unconstitutional provisions are so connected and interdependent in subject matter, meaning, and purpose that it cannot be believed that the legislature would have passed the one without the other, or where the portion eliminated is so intimately connected with the rest of the statute as to make it useless to accomplish any of the purposes of the legislature. [Citations.]"

■ Applying these principles to the 1955 act, we find that when sections one and two thereof are substituted for sections twelve and thirteen of the act of 1951, which they amend, the legislature has stated its intention in section eighteen of the original act that these sections be considered separable. While such a saving clause is not conclusive, it does give us assurance that the legislature would have passed the act even though it knew that section three were to be eliminated. See *State ex rel. King County v. State Tax Comm.*, 174 Wash. 336, 24 P. (2d) 1094 (1933). But apart from this, our analysis of the purpose of the several sections of the 1955 act clearly manifests the intention of the legislature that these sections be separable and capable of functioning independently of each other.

■ Sections one, two, and four of the 1955 act relate to subversive activities generally, and to the communist party particularly. Section three, however, pertains to subversive activities generally and, in particular, is nothing more than an abortive attempt on the part of the legislature to designate by reference about 250 other organizations as subversive within the definition contained in section one of the 1951 act, as amended by Laws of 1953, chapter 142, § 1 (*cf.* RCW 9.81.010). By designating the communist party as a subversive organization in section four, the legislature supplied the reason why it required in section one, as a condition of public employment, that every present and prospective public employee state, under oath, whether he

or she was then a member of the communist party, except in nonsensitive occupations, as provided in section two. Obviously, sections one and four were designed to prevent any claim (which the legislature found to be entirely unfounded in fact) that the communist party was not, and is not, a "subversive organization" as defined in the 1951 act, as amended.

It is thus apparent that the invalidity of section three does not vitiate the remainder of the 1955 act. Absent section three, the entire subversive activities act (including the amendments made by section one, two, and four of the 1955 act) can be administered in precisely the same manner as with section three, with the single exception that no list of alleged subversive organizations prepared by the United States attorney general may be used to designate membership in proscribed organizations. Since section three of the 1955 act is clearly separable and a workable statute remains after its severance, we cannot sustain the above quoted conclusion of the trial court.

Respondents further argue that "the state has no power to enact a subversive activities control statute." They cite *Pennsylvania v. Nelson*, 350 U. S. 497, 100 L. Ed. 640, 76 S. Ct. 477 (1956), wherein the defendant was charged and convicted in the Pennsylvania *state* court with an attempt to overthrow the government of the *United States* by force and violence contrary to the Pennsylvania sedition act of 1949. The United States supreme court (affirming the decision of the supreme court of Pennsylvania) there held that certain *Federal* legislation had pre-empted the field of sedition against the *United States*.[17] As we understand that case, the court did not hold, either expressly or by implication, that a sovereign state was precluded from enacting laws designed to suppress acts of sedition against the state itself. Moreover, the *Nelson* case had no relation whatever to, and did not involve, the power of a state to enact state laws and regulations prescribing qualifications prerequisite

---

[17]See *State v. Diez* (Fla.) 97 So. (2d) 105 (1957) for a comprehensive discussion of the inapplicability of the *Nelson* case to state statutes prescribing conditions precedent to public employment.

to public employment. But even if we assume, *arguendo*, that Federal legislation has pre-empted the field of sedition against both *Federal and state* governments, still that which has just been said above concerning separability of the 1955 act applies with equal force to the separability of the penal sections (§§ 2 and 3) of the 1951 act from those sections (§§ 1 and 2 of the 1955 act) prescribing qualifications for public employment.

Respondents complain that the statute[18] which requires them to execute the oath in question is a bill of attainder and, as such, contravenes Art. I, § 23, of the state constitution and Art. I, § 10, of the United States constitution.[19] Their argument is substantially the same as that rejected by this court in *Huntamer v. Coe*, 40 Wn. (2d) 767, 246 P. (2d) 489 (1952), wherein we held that section 16, as implemented by section 1(e) of the act of 1951 (requiring a similar oath as a condition precedent to filing a declaration of candidacy for any public office), was not unconstitutional for these reasons.

■ Section twelve of the 1951 act, as amended by Laws of 1955, chapter 377, § 1, requires only that every present or prospective public employee state, under oath, whether he or she is "a member of the communist party or other subversive organization" at the time the oath is taken. No punishment for past conduct or political activity is involved. Only one qualification precedent to public employment is imposed. In short, this section is clearly neither *ex post facto* nor in the nature of a bill of attainder. *Huntamer v. Coe, supra; Garner v. Board of Public Works of Los Angeles*, 341 U. S. 716, 95 L. Ed. 1317, 71 S. Ct. 909 (1951); *American Communications Ass'n v. Douds*, 339 U. S. 382, 413, 94 L. Ed. 925, 70 S. Ct. 674 (1949); *Pickus v. Board of Education of Chicago*, 9 Ill. (2d) 599, 138 N. E. (2d) 532 (1956).

---

[18]Laws of 1951, chapter 254, § 12, as amended by Laws of 1955, chapter 377, § 1.

[19]"No bill of attainder, ex post facto law . . . shall ever be passed." Art. I, § 23, of the Washington constitution.

"No state shall . . . pass any bill of attainder, ex post facto law, . . ." Art. I, § 10, of the United States constitution.

■ Nor do we find merit in respondents' assertion that section twelve, as amended, violates Art. I, § 9, of the Washington constitution[20] or that clause of the fifth amendment to the United States constitution which provides that no person "shall be compelled in any criminal case to be a witness against himself." Respondents are not compelled by section twelve to do anything. But, if they desire to remain in public employment, they must comply with the standards of eligibility established by the legislature, and their refusal to do so renders them ineligible for further employment.

Respondents also attack the oath requirement of the act, contending that it abridges their rights of freedom of speech and assembly protected by Art. I, §§ 4 and 5, of the Washington constitution,[21] and the first and fourteenth amendments to the United States Constitution.[22]

*Pickus v. Board of Education of Chicago, supra,* was an action for a declaratory judgment and an injunction holding unconstitutional, and restraining the enforcement of, that section of the Illinois finance act of 1955 which required all public employees to execute a "non-communist affidavit" as a condition precedent to receiving compensation for their services from the state or its political subdivisions. In the course of its opinion, holding the section involved to be constitutional, the Illinois supreme court, speaking through Chief Justice Klingbiel, said:

"Plaintiffs assert that section 30b is an unwarranted denial of the right to speak. They fail to point out, however, the respect or way in which they consider such right to be involved here. The statute simply provides for the execution of an affidavit of fact. It does not purport to limit or restrict the right of employees to speak or assemble."

---

[20]"No person shall be compelled in any criminal case to give evidence against himself, or be twice put in jeopardy for the same offense." Art. I, § 9, of the Washington constitution.

[21]"The right of petition and of the people peacefully to assemble for the common good shall never be abridged." § 4.

"Every person may freely speak, write, and publish on all subjects, being responsible for the abuse of that right." § 5.

[22]"Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof; or abridging the freedom of

And, in *Albert Appeal*, 372 Pa. 13, 92 A. (2d) 663 (1952), a teacher in the Pittsburgh public school system was dismissed and her contract terminated by the board of education after a hearing on charges preferred by the superintendent of schools of Pittsburgh that she was a communist, and for "advocation of or participating in un-American or subversive doctrines." In affirming the decision dismissing the teacher's appeal, the court said:

"There is no question of the right of free speech involved in this case. Miss Albert is not being penalized in her capacity *as a private citizen* because of any political, economic or social views she may entertain or any expression she may care to give to those views. The concern here is with her rights as a *teacher*, and the legislature can certainly prescribe qualifications for teachers in the public schools with respect not only to their academic attainments but also to their moral characters and their loyalty to the state and federal governments. Judge (later Mr. Justice) Holmes, in a characteristically epigrammatic phrase, said in *McAuliffe v. Mayor of New Bedford*, 155 Mass. 216, 220, 29 N. E. 517: 'The petitioner may have a constitutional right to talk politics, but he has no constitutional right to be a policeman.' To the same effect, Mr. Justice Minton, speaking for the United States Supreme Court, said in *Adler v. Board of Education of the City of New York*, 342 U. S. 485, 492 [96 L. Ed. 517, 524, 27 A. L. R. (2d) 472, 476 (1952)]: 'It is clear that such persons [employed or seeking employment in the public schools] have the right under our law to assemble, speak, think and believe as they will. . . . It is equally clear that they have no right to work for the State in the school system on their own terms. . . . If they do not choose to work on such terms, they are at liberty to retain their beliefs and associations and go elsewhere. Has the State thus deprived them of any right to free speech or assembly? We think not.' "

---

speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances." Art. I.

"All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside. No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws." Art. XIV, § 1.

After stating the matter just quoted, the United States supreme court, in the *Adler* case, went on to say:

"If, under the procedure set up in the New York law, a person is found to be unfit and is disqualified from employment in the public school system because of membership in a listed [subversive] organization, he is not thereby denied the right of free speech and assembly. His freedom of choice between membership in the organization and employment in the school system might be limited, but not his freedom of speech or assembly, except in the remote sense that limitation is inherent in every choice. Certainly such limitation is not one the state may not make in the exercise of its police power to protect the schools from pollution and thereby to defend its own existence."

In *Fitzgerald v. Philadelphia*, 376 Pa. 379, 102 A. (2d) 887 (1954), a nurse, who had been dismissed from her employment in the Philadelphia General Hospital for declining to take the oath required by section five of the Pennsylvania loyalty act of 1951,[23] sought reinstatement. In affirming a judgment adverse to her, the supreme court of Pennsylvania said:

"We do not understand that appellant argues—or indeed could argue—that the Commonwealth or any of its political subdivisions cannot refuse employment, or discontinue it, in the case of anyone who is knowingly a member of a subversive organization. It would be intolerable for any government to retain in its employ one who advocates its overthrow by force or violence or knowingly consorts with others in an organization having such an objective. What we held in *Albert Appeal*, 372 Pa. 13, 92 A. (2d) 663, and what the Supreme Court of the United States held in *Adler v. Board of Education of the City of New York*, 342 U. S. 485, in regard to teachers applies equally to all public employees, namely, that the legislature, as a condition of their employment, may prescribe qualifications with respect not only to their general attainments but also to their moral character and their loyalty to the state and federal governments, and, to that end, may deny them public employment if they are knowingly members of a disloyal and seditious organization. . . . That being so, the oath pre-

---

[23]It is significant to note that the statute there involved is strikingly similar to section twelve of the subversive activities act which is involved in this case.

scribed by the 1951 Act is obviously justified for the purpose of informing the appointing authority as to whether the employe is in fact a member of an organization which he knows is subversive in character and therefore is not a fit person to be entrusted with the duty of supporting and advancing the interests of the very government whose destruction he is seeking to accomplish."

Shortly after this case was argued in this court, the supreme court of the United States rendered its decisions in *Beilan v. Board of Education*, 357 U. S. 399, 2 L. Ed. (2d) 1414, 78 S. Ct. 1317 (1958), and *Lerner v. Casey*, 357 U. S. 468, 2 L. Ed. (2d) 1423, 78 S. Ct. 1311 (1958). In the former, a teacher was discharged by the board of education on its finding of "incompetency" because of his refusal to answer questions relating to his past communistic affiliations and activities. In upholding the decision of the Pennsylvania supreme court, sustaining the board's action, the United States supreme court carefully pointed out that the teacher was discharged not for disloyalty, but for "incompetency," and that such discharge did not violate the due process clause of the fourteenth amendment.

In the *Lerner* case, the court upheld a judgment of the New York court of appeals, which had the effect of sustaining the dismissal of a subway conductor, employed by the New York City Transit Authority, who, when asked (by the commissioner of investigation of New York City) whether he was *then* a member of the communist party, refused to answer, claiming his privilege against self-incrimination under the fifth amendment. He was subsequently suspended, and later discharged. A finding " 'that, upon all the evidence, reasonable grounds exist for belief that, because of his doubtful trust and reliability . . .' [his] continued employment would endanger national and state security," was based on his refusal to answer the question asked. The supreme court accepted the reasoning of the court of appeals that the city employee had been discharged neither

" . . . because of any inference of Communist Party membership which was drawn from the exercise of the Fifth Amendment privilege [which, the court pointed out,

was not available to appellant through the fourteenth amendment in this city investigation], nor because of the assertion of that constitutional protection, but rather because of the doubt created as to his 'reliability' by his refusal to answer a relevant question put by his employer, . . . ."

Like the *Lerner* case, *supra*, the question which section twelve of our 1951 act, as amended in 1955, requires respondents to answer is whether or not they *are* members of the *communist party*, or other subversive organization.

That the communist party was, in fact, a subversive organization, as defined in the 1951 act, at the time that our legislature designated it as such (by § 4 of the 1955 act) can scarcely be doubted. (See appendix C.)

Even prior to the commencement of hostilities in Korea in 1950, numerous judges had recognized the communist party as a part of a world conspiracy having as its prime objective the overthrow of the United States government by force and violence, or whatever means possible, constitutional or otherwise.[24] Since then, Congress, in 1950, enacted legislation designed to control the communist party,[25] and, in 1954, proscribed it.[26] The courts of New Jersey[27] and Pennsylvania[28] take judicial notice of the fact. We can, and do now, hold likewise, because the fact that the communist party is a subversive organization is now a matter of common knowledge.

It is settled law that the state may inquire of its employees regarding matters that may prove relevant to

[24]E.g., Concurring opinion of Mr. Justice Jackson in *American Communications Ass'n v. Douds*, 339 U. S. 382, 94 L. Ed. 925, 70 S. Ct. 674; dissenting opinion of Mr. Chief Justice Stone in *Schneiderman v. United States*, 320 U. S. 118, 87 L. Ed. 1796, 63 S. Ct. 1333 (1942); dissenting opinions in *State ex rel. Huff v. Reeves*, 5 Wn. (2d) 637, 106 P. (2d) 729, 130 A. L. R. 1465 (1940).

[25]Title I (the subversive activities control act of 1950) of the internal security act of 1950 (the McCarran act) of September 23, 1950, 64 Stat. 987, 50 U. S. C. A., § 781, *et seq.*

[26]Communist control act of 1954 of August 24, 1954, 68 Stat. 775, 50 U. S. C. A., § 841, *et seq.*

[27]*Laba v. Newark Board of Education*, 23 N. J. 364, 129 A. (2d) 273 (1957).

[28]*Albert Appeal*, 372 Pa. 13, 92 A. (2d) 663 (1952).

their fitness and suitability for public service. *Adler v. Board of Education, supra; Garner v. Los Angeles Board of Public Work, supra.* Particularly is this true with respect to the employment of teachers in its public schools and institutions of higher learning. The reasons compelling this conclusion are aptly pointed out by the New Jersey supreme court in *Laba v. Newark Board of Education,* 23 N. J. 364, 129 A. (2d) 273 (1957), which quoted with approval from *Thorp v. Board of Trustees of Schools for Industrial Education,* 6 N. J. 498, 79 A. (2d) 462 (1951), judgment vacated as moot, 342 U. S. 803, 96 L. Ed. 608, 72 S. Ct. 35 (1951), as follows:

"The maintenance of the purity of the educational process against corruption by subversive influences is of the highest concern to society. It is in no real sense a denial of academic freedom to require of a teacher, as a condition to employment, a sworn disavowal of allegiance to the doctrine of force or violence as a mode of overthrowing government. That would seem to be axiomatic. Loyalty to government and its free democratic institutions is a first requisite for the exercise of the teaching function. Freedom from belief in force or violence as a justifiable weapon for the destruction of government is of the very essence of a teacher's qualifications. The apprehended danger is real and abiding. We have long had evidences of the pressure here of a godless ideology ruthlessly fostered by a foreign power which has for its aim the violent overthrow of government and free society. And one of its weapons is the debasement of teaching as a softening measure in the consummation of the subversive process. The school system affords the opportunity and means for subtle infiltration. *There is no intrusion upon personal freedoms when government intervenes, as it has here, to avert this peril to its very existence. A teacher who is bereft of the essential quality of loyalty and devotion to his government and the fundamentals of our democratic society is lacking in a basic qualification for teaching.* The teacher is not obliged to take the oath; but if he refuses to do so he is not entitled to teach. In the current struggle for men's minds, the State is well within its province in ensuring the integrity of the educational process against those who would pervert it to subversive ends." (Italics ours.)

In *Adler v. Board of Education, supra*, the supreme court said:

" . . . A teacher works in a sensitive area in a schoolroom. There he shapes the attitude of young minds towards the society in which they live. *In this, the state has a vital concern.* It must preserve the integrity of the schools. That the school authorities have the right and the duty to screen the officials, teachers, and employees as to their fitness to maintain the integrity of the schools as a part of ordered society, cannot be doubted. One's associates, past and present, as well as one's conduct, may properly be considered in determining fitness and loyalty. From time immemorial, one's reputation has been determined in part by the company he keeps. In the employment of officials and teachers of the school system, the state may very properly inquire into the company they keep, and we know of no rule, constitutional or otherwise, that prevents the state, when determining the fitness and loyalty of such persons, from considering the organizations and persons with whom they associate." (Italics ours.)

In this case, because of their positions in a "sensitive" area, each respondent is required, by section twelve of the 1951 act, as amended in 1955, to state, upon oath, whether he is a member of the communist party or other subversive organization.

■ The foregoing authorities clearly hold that, without violating any of the constitutional rights here invoked by respondents, the state is entitled to ask this question and to demand an answer as a condition of continued employment. Refusal to answer is sufficient grounds for discharge, whether it be for "incompetency" (*Beilan v. Board of Education, supra*), or because by his lack of candor he provides evidence of his "doubtful trust and reliability." (*Lerner v. Casey, supra.*)

■ Respondents also contend that the form of oath which appellants demanded that they sign violates the due process clause of the fourteenth amendment[29] to the United

---

[29]See note 21, *supra*.

States constitution, and Art. I, §§ 3 and 12,[30] of the state constitution, in failing to include the element of *scienter* of the subversive character of a subversive organization on the part of the prospective affiant. As we interpret the form of oath, we find that this element is implied in every clause thereof and of the pertinent statutory provisions. See *Garner v. Board of Public Works of Los Angeles, supra.* As so construed, the case for *Wieman v. Updegraff, supra,* on which respondents rely, has no application.

## Conclusion

No authority, state or Federal, has been called to our attention (and we have discovered none from our own research) holding either:

(a) That the states have been deprived of their control over public schools or institutions of higher learning operated by them, including the power to protect the students therein against the possible exertion of subversive influence by their teachers or other instructors; *or*

(b) That the states have been deprived of the right to investigate the qualifications (including loyalty) of their employees who are paid by public funds.

In the absence of such authority, this court must hold that all of the provisions of the Laws of 1955, chapter 377, *except* section three thereof, are a valid exercise of the sovereign power of the state for the protection of the state of Washington and its existing educational institutions, and their respective students, under the tenth amendment to the United States constitution, reading as follows:

"The powers not delegated to the United States by the constitution, nor prohibited by it to the states, are reserved to the states respectively, or to the people."

We are further of the opinion that the 1955 act (except § 3) does not in any respect contravene any of the provi-

---

[30]"No person shall be deprived of life, liberty, or property without due process of law." Art. I. § 3, of the Washington constitution.

"No law shall be passed granting to any citizen, class of citizens, or corporation, other than municipal, privileges or immunities which, upon the same terms, shall not equally belong to all citizens or corporations." Art. I, § 12, of the Washington constitution.

sions of our state constitution or of the United States constitution which have been invoked by respondents.

It follows from what has been said herein that the action of appellants in demanding that respondents sign the form of oath attached to the complaint was correct.

The decree of the trial court is reversed with directions to dissolve the permanent injunction restraining appellants from performing their official duties under the 1955 act (except § 3) with respect to respondents and to dismiss their action.

Neither party shall be allowed costs in this court.

ALL CONCUR.

## APPENDIX A

Excerpts from House Concurrent Resolution No. 10, Laws of 1947, p. 1378.

"WHEREAS, These are times of public danger; subversive persons and groups are endangering our domestic unity, so as to leave us unprepared to meet aggression, and under cover of the protection afforded by the bill of rights these persons and groups seek to destroy our liberties and our freedom by force, threats and sabotage, and to subject us to the domination of foreign powers; and

"WHEREAS, Recent announcements by responsible officers of the federal government indicate the seriousness of the problem. J. Edgar Hoover, Director of the Federal Bureau of Investigation,* recently said: 'During the past five years American Communists have made their deepest inroads upon our national life. Their propaganda, skillfully designed and adroitly executed has been projected into practically every phase of our national life. The Communist influence has projected itself into some newspapers, books, radio and the screen, some churches, schools, colleges and even fraternal orders have been penetrated, not with the approval of the rank and file, but in spite of them'; and

"WHEREAS, State legislation to meet the problem and to assist law enforcement officers can best be based on a thor-

---

*In 1957, after nearly forty years' experience in dealing with communist activities in the United States, Mr. Hoover reported to the American public on this subject in "Masters of Deceit" (Library of Congress Catalog Card No. 58-7643). For a description of communist party operations in the United States, see parts II, III, and IV.

ough and impartial investigation by a competent and active legislative committee;

"*Now, Therefore, Be It Resolved,* That there is hereby created a Joint Legislative Fact-finding Committee on Un-American Activities in the State of Washington which shall investigate, ascertain, collate and appraise all facts concerning individuals, groups or organizations whose activities are such as to indicate a purpose to foment internal strife, discord and dissension; infiltrate and undermine the stability of our American institutions; confuse and mislead the people; and impede the normal progress of our state and nation either in a war time or a peace time economy; and

"*Be It Further Resolved,* That in addition to other duties imposed upon the committee, the committee shall investigate the activities of groups and organizations whose membership includes persons who are communists, or any other organization known or suspected to be dominated or controlled by a foreign power, which activities affect the conduct of this state, the functioning of any state agency, unemployment relief and other forms of public assistance, educational institutions of this state supported in whole or in part by state funds, or any political program; and

"*Be It Further Resolved,* That the committee shall consist of four members of the House of Representatives, appointed by the speaker thereof; and three members of the Senate appointed by the president thereof and they shall be subject to confirmation of their respective bodies. The speaker of the House of Representatives shall appoint the chairman of the board; and

"*Be It Further Resolved,* That the committee hereby created . . . shall have . . . all powers necessary or convenient to accomplish the objects and purposes of this resolution, including but not limited to the following duties and powers: . . .

"(5) To hold public hearings at any place in the State of Washington at which hearings the people are to have an opportunity to present their views to the committee;

"(6) To make a complete study, survey and investigation of every phase of the subject of this resolution, including but not limited to the operation, effect, administration, enforcement, and needed revision of any and all laws in anywise bearing upon or relating to the subject of this resolution;

"(7) To meet at any and all places in this state, in public or executive session;

"(8) To act during this session of the legislature, including any recess hereof, and after final adjournment hereof until commencement of the thirty-first legislature;

"(9) To file a report with the thirty-first legislature; . . ."

APPENDIX B

I.

Pertinent prefatory remarks of the Joint Fact-finding Committee on Un-American Activities in the State of Washington addressed to the Speaker of the House of Representatives and the Thirtieth Legislature, contained in the First Report, Un-American Activities in Washington State, 1948, are as follows:

"The testimony and evidence in the first hearings prove conclusively, in the judgment of your Committee, that:

"1. Communists in the State of Washington operate under, and undeviatingly follow, policies laid down for them by the Soviet government.

"2. These policies are promulgated on a nation-wide basis and that the activities of Communists in the State of Washington are coordinated with Communist activities in the other states of the union.

"3. The dovetailed nation-wide program is designed to create distrust of their form of government in the minds and hearts of the American people; create unrest and civil strife, and impede the normal processes of state and national government, all to the end of weakening and ultimately destroying the United States as a constitutional republic and thereby facilitating the avowed Soviet purpose of substituting here a totalitarian dictatorship.

"Fantastic as this may appear to the uninitiate and the naïve, the testimony produced at the public hearings clearly brings into view the extreme danger of the Soviet directed Communist conspiracy to the peace and security of the people of the State of Washington and the United States."

II.

Salient prefatory remarks of the above mentioned committee addressed to the Thirty-first Legislature of the State of Washington, contained in the Second Report, Un-American Activities in Washington State, 1948, are:

"The hearing, conducted by a legally appointed committee of the legislature, met with much resistance and actual

sabotage in its proceedings. Under the guise of a 'picket line' Communist inspired marchers surrounded the 146th Field Artillery Armory, scene of the hearing, and raised their voices in shouting in an obvious attempt to drown out the testimony of witnesses.

"Seattle police arrested ringleaders of the demonstrations on charges of disorderly conduct. Joint efforts of Seattle police and the State Patrol were necessary to quell the disturbances so that your Committee could carry on its hearings in an orderly manner.

"While the number of University faculty members exposed as having or having had Communist Party affiliations was relatively small compared with the actual size of the faculty, the hearing developed that the pattern of Communist infiltration was identical with that employed by the Communists in other fields.

"In virtually every field in which they ultimately have been the dominating influence the Communists start with a small but active minority who almost invariably conceal their affiliations and operate as so-called 'liberals.'

"Your Committee wishes to direct particular attention to the testimony concerning not only the University of Washington but to the proven Communist domination of the Repertory Playhouse, an off-campus school of the drama, which has drawn many of its students from the University. Testimony concerning the affiliation of the leadership of this school with Communist activities is preponderant, and, to the uninitiate, startling in the extreme."

## III.

Excerpts from the Report of Un-American Activities Committee to the Thirty-first Legislature of the State of Washinton (House Journal, 1949, p. 1095, *et seq.*):

". . . The State of Washington is acrawl with trained and iron disciplined Communists. They have operated here with seeming immunity. Many of them hold almost impregnable positions of confidence and trust in their communities. They have successfully infiltrated their constant objectives, education, government, labor and municipal services. They effectively operate and manipulate an incredible maze of propaganda outlets known as Communist Front Organizations.

"If the Communists are permitted to work unhampered a short time more in American education, the significance of our historic background will be almost completely lost to a

generation of Americans. Our endeavors in uncovering Communist activity in education were largely confined to disclosure of evidence showing that Communists agents are being employed by this state in tax supported institutions.

"We did not at this time investigate to any great extent the substance of any teaching. We felt it sufficient to disclose the aims of the Communists in education and point out the rigid discipline and control held by the Party over its members. It then becomes obvious that a member of the Communist Party could not possibly shed his communism on entering the classroom. That as a Communist he is dedicated to the overthrow of the system and state employing him. That as a Communist he has subordinated his belief in academic freedom to the will of the Communist Party. By his own consent he is no longer a free agent and when he talks of academic freedom and civil rights it becomes the rankest hypocrisy. . . .

"Early in our investigations it became apparent that a large and well-organized group of disciplined Communists are operating in the State of Washington and have been for many years. These Communists are agents of Soviet Russia through their membership and strict loyalty to the Communist Party. Some are aliens, more are American born, but all are alike in their undeviating obedience to the dictates of the Kremlin laid down to them in what is known as the Party Line.

"Every Communist and Communist sympathizer is a potential saboteur and spy and it is the rankest nonsense to finance this program of self-destruction with public funds. An alarming number of Communists are on federal, state and municipal payrolls.

"The predatory nature of the world Communist Party is well attested to by many former Communists in the transcripts of our two public hearings which are appended to and made a part of this report. They are identified as 'First Report on Un-American Activities in Washington State' and 'Second Report on Un-American Activities in Washington State.'

"In addition to the printed reports of testimony taken at our two public hearings, the Committee has accumulated an index file of approximately 40,000 subjects dealing with Communists, their Front Organizations and activities and related materials. In the case of notorious Communists such as . . . [certain persons named], their cards may have scores of individual notations and cross references. We have

found a pattern of Communist intrigue and conspiracy of alarming proportions extending over the State of Washington and the Pacific Northwest like a huge spider web. The cables of this web are imbedded deep in federal, state, and municipal government, all levels in education, state welfare programs, labor organizations and religion. . . .

"While engaged in an intensive investigation in these two fields of Communist activity, it became increasingly apparent that all Communist activity in all fields is interrelated. That Communist agents while assigned to different projects are all dedicated to the same objective; the softening up of our people for the eventual violent overthrow of our government. That they work as a team taking their orders from the top, and that they do not deviate in the minutest detail from the Party Line and Party instructions. This may involve the following out of some minor Party assignment in a labor organization, outside speaking engagements for a university professor, or obedience to accepted Party conduct before a legislative hearing. No deviation from Party instructions is permitted—none occurs. . . ."

(For the committee's remarks concerning "Academic Freedom," particularly with reference to its investigation of subversive activities at the University of Washington, see that subheading in its report commencing on page 1110 (House Journal, 1949), and the letter of Raymond B. Allen, then president of the University of Washington, set out at length therein.)

Continuing the quotation from the aforementioned report, at page 1117 of the House Journal (1949):

"J. Edgar Hoover is one of the outstanding and most vocal enemies of the Communists and has repeatedly stated that the members of the Communist Party in America are fifth column agents representing a hostile government. . . .

"In reply to a question regarding the initiation of criminal prosecutions by the FBI in cases where federal employees failed to disclose Communist Party affiliations, Mr. Hoover stated:

" 'Criminal prosecutions are initiated in proper cases, but not by the FBI. That is a responsibility of the prosecuting officials of the Department of Justice and the various United States attorneys. It's not a simple matter to prove that one is a Communist. In fact, the most dangerous Communists

in the nation today are not the open, avowed, card-carrying Party members. They seek to attach themselves to liberal and progressive movements. They conceal their real Communist affiliations, because they know that once exposed they will outlaw themselves in the hearts and minds of Loyal Americans. A real Communist supporter can be identified by his acts—he follows his party line, espouses the Party's causes and often furthers its aims by his overt acts.

" 'The Communist Party has long regarded infiltration of the government service as a project carrying highest priority. They have sought to accomplish this under the guise of secrecy. The menace of Communists in government service is a threat to our national security because of (1) opportunity to engage in espionage to the detriment of our national defense; (2) opportunity to influence the formulation and carrying out of governmental policies; (3) opportunity to promote Communist propaganda, creating disruption and undermining public confidence; (4) opportunity to recruit Party members in government service, or soliciting the aid of innocent co-workers in assisting them to carry out Party assignments; and (5) opportunity to place other Communists in government service. One person whose loyalty to the Communist cause exceeds his loyalty to the United States could, if properly placed, do irreparable harm to our security.' "

The committee recommended, *inter alia*:

"(11) To press with all vigor and energy and all its resources the investigation into Communism in our tax-supported schools, both common schools and institutions of higher learning. Communists already have made salutary [*sic*] inroads into our education system. Testimony, including that of high ex-Communists, in the first and second committee reports, disclose the alarming progress that has been made.

"In the blue print for Communist infiltration the Communist objective is summed up in these simple words:

" 'In destroying the capitalist monopoly of the means of production, the working class must also destroy the capitalist monopoly of education; that is, it must take possession of all the schools, from the elementary schools to the universities.' * (Program of the Communist International, adopted by the Sixth World Congress, Sept. 1, 1928, Moscow. 'Blue Print for World Conquest,' page 206.)

"As heretofore stated, your Committee had opportunity

merely to scratch the surface of Communist infiltration in our tax-supported school system.

"(12) The successor committee, or a separate committee be authorized to fully investigate the manner in which textbooks and all other reading matter in our schools is chosen and approved, and that the Legislature make it mandatory to either delegate existing agencies or create a separate agency with the responsibility of stemming the flow of subversive reading matter that is finding its way into some of the classrooms of our schools."

APPENDIX C

I.

Schwartz, The Supreme Court, chapter 9, page 317:

"Perhaps the most striking judicial statement of the actual character of the American Communist Party is to be found in a 1950 opinion of Justice Jackson [concurring opinion in *American Communications Ass'n v. Douds*, 339 U. S. 382, 413, 94 L. Ed. 925, 70 S. Ct. 674 (1949)], which is remarkable for the breadth of its language and its judicial notice of data not in evidence before the Court.

"From information before its several Committees [reads the opinion referred to], and from facts of general knowledge, Congress could rationally conclude that, behind its political party facade, the Communist Party is a conspiratorial and revolutionary junta, organized to reach ends and to use methods which are incompatible with our constitutional system. A rough and compressed grouping of this data would permit Congress to draw these important conclusions as to its distinguishing characteristics.

"1. The goal of the Communist Party is to seize powers of government by and for a minority rather than to acquire power through the vote of a free electorate. . . .

"2. The Communist Party alone among American parties past or present is dominated and controlled by a foreign government. . . .

"3. Violent and undemocratic means are the calculated and indispensable methods to attain the Communist Party's goal. It would be incredible naivete to expect the American branch of this movement to forego the only methods by which a Communist Party has anywhere come into power.

"4. The Communist Party has sought to gain this leverage and hold on the American population by acquiring control of the labor movement. . . .

"5. Every member of the Communist Party is an agent to execute the Communist program.

"Although unsupported by the kind of evidence that would usually be required in a law court, the broad indictment of the Communist Party in Justice Jackson's opinion comports with the common sense of the subject. . . ."

II.

Report of (United States) House of Representatives Committee on Un-American Activities relative to the Internal Security Act of 1950 (House Report No. 2980, dated August 22, 1950):

"NECESSITY FOR LEGISLATION

"The need for legislation to control Communist activities in the United States cannot be questioned.

"Over 10 years of investigation by the Committee on Un-American Activities and by its predecessor committee has established (1) that the Communist movement in the United States is foreign-controlled; (2) that its ultimate objective with respect to the United States is to overthrow our free American institutions in favor of a Communist totalitarian dictatorship to be controlled from abroad; (3) that its activities are carried on by secret and conspiratorial methods; and (4) that its activities, both because of the alarming march of Communist forces abroad and because of the scope and nature of Communist activities here in the United States, constitute an immediate and powerful threat to the security of the United States and to the American way of life.

"The Communist program of conquest through treachery, deceit, infiltration, espionage, sabotage, corruption, and terrorism has been carried out in country after country and is an ever-growing threat to the national security of this and other countries. There is ample evidence that one of the primary objectives of the world Communist movement, directed from within the most powerful existing Communist totalitarian dictatorship, is to repeat this pattern in the United States.

"There is incontrovertible evidence of the fact that the Communist Party of the United States is dominated by such totalitarian dictatorship and that it is one of the principal instrumentalities used by the world Communist movement, in its ruthless and tireless endeavor to advance the world march of communism.

"The findings which support these conclusions, and the

vast quantity of evidence on which they are based, are set forth in detail in the numerous reports which this committee and its predecessors have printed and circulated. Corroboration has been supplied by independent and exhaustive research by other committees of Congress.

"Concern over this threat is not limited to the legislative branch of our Government. At the present time 30 of the 70 major countries in the world have outlawed the Communist Party. Many other countries have adopted various legislative decrees against communism, and since 1947 the trend has been toward declaring all Communist activities illegal. Panama was the latest to take such action. This action came in April of this year.  .  .  .

"Concern over the Communist threat has not been overlooked by the different State legislatures. At the present time 33 States have laws against the displaying of the 'Red' flag; 12 States have criminal anarchy laws; 16 have criminal syndicalism laws; 22 have sedition laws; 16 have laws against the Communist Party candidates appearing on the election ballot; 19 States exclude Communists from public employment; 28 States require loyalty oaths of all employees; and 20 States require teachers to take loyalty oaths."

III.

Communist Control Act of 1954, August 24, 1954, chapter 886, § 2, 68 Stat. 775, 50 U. S. C. A., § 841.

"Sec. 2. The Congress hereby finds and declares that the Communist Party of the United States, although purportedly a political party, is in fact an instrumentality of a conspiracy to overthrow the Government of the United States. It constitutes an authoritarian dictatorship within a republic, demanding for itself the rights and privileges accorded to political parties, but denying to all others the liberties guaranteed by the Constitution. Unlike political parties, which evolve their policies and programs through public means, by the reconciliation of a wide variety of individual views, and submit those policies and programs to the electorate at large for approval or disapproval, the policies and programs of the Communist Party are secretly prescribed for it by the foreign leaders of the world Communist movement. Its members have no part in determining its goals, and are not permitted to voice dissent to party objectives. Unlike members of political parties, members of the Communist Party are recruited for indoctrination with respect to its objectives and methods, and are organized, instructed, and disciplined to carry into action slavishly

the assignments given them by their hierarchical chieftains. Unlike political parties, the Communist Party acknowledges no constitutional or statutory limitations upon its conduct or upon that of its members. The Communist Party is relatively small numerically, and gives scant indication of capacity ever to attain its ends by lawful political means. The peril inherent in its operation arises not from its numbers, but from its failure to acknowledge any limitation as to the nature of its activities, and its dedication to the proposition that the present constitutional Government of the United States ultimately must be brought to ruin by any available means, including resort to force and violence. Holding that doctrine, its role as the agency of a hostile foreign power renders its existence a clear present and continuing danger to the security of the United States. It is the means whereby individuals are seduced into the service of the world Communist movement, trained to do its bidding, and directed and controlled in the conspiratorial performance of their revolutionary services. Therefore, the Communist Party should be outlawed."

March 20, 1959. Petition for rehearing denied.