[No. 34451. *En Banc.* April 20, 1961.]

HOWARD L. NOSTRAND et al., *Respondents,* v. HERBERT S. LITTLE et al., *Appellants.*\*

\*Reported in 361 P. (2d) 551.

*The Attorney General, Herbert H. Fuller, Chief Assistant,* and *Timothy R. Malone, Assistant,* for appellants.

*Francis Hoague* and *Solie M. Ringold,* for respondents.

DONWORTH, J.—This case was originally decided by this court January 29, 1959, and was then entitled *Nostrand v.*

*Balmer*. Our decision is reported in 53 Wn. (2d) 460, 335 P. (2d) 10, to which reference is made for a preface to the present opinion.

Thereafter, the case was appealed to the Supreme Court of the United States and, after being argued and considered by that court, a *per curiam* opinion was filed May 2, 1960 (two justices dissenting), which is reported in 362 U. S. 474, 4 L. Ed. (2d) 892, 80 S. Ct. 840.

The mandate of the Supreme Court received June 13, 1960, directed that our judgment, entered March 20, 1959, be vacated and the cause remanded for further proceedings not inconsistent with the *per curiam* opinion.

Accordingly, this court, by order entered June 17, 1960, vacated its judgment of March 20, 1959, and set the cause for further hearing *en banc* at its September, 1960, session for a consideration of the following issues:

1. Whether the plaintiffs have raised, either in the trial court or in this court, the claim that they should be afforded such hearing to explain or defend their refusal to take the oath; and

2. If such claim is properly before this court, whether the pertinent statutes of the state of Washington do or do not afford them such a hearing; and

3. If these statutes do not afford them such a hearing, whether plaintiffs are thereby denied due process of law under the constitution of the United States or the constitution of the state of Washington.

For convenience, we shall in this opinion refer to the plaintiffs Nostrand and Savelle as "the professors," and to the defendant state officers as "the regents."

At this hearing which was held September 21, 1960, counsel for the parties submitted briefs and presented oral arguments bearing on these issues.

Before considering the issues above referred to, we wish to refer to the *per curiam* opinion of the Supreme Court, in which the reasons for remanding the case to this court are stated.

We think that it will be helpful to have in mind the circumstances under which this case has been remanded

to this court and, therefore, we quote the *per curiam* opinion in full (omitting only the reference to *Seattle v. Ross,* 54 Wn. (2d) 655, 344 P. (2d) 216 (1959), referred to below[1]):

"Washington requires every public employee to subscribe to an oath that he is 'not a subversive person or a member of the Communist Party or any subversive organization, foreign or otherwise, which engages in or advocates, abets, advises, or teaches the overthrow, destruction or alteration of the constitutional form of the government of the United States, or of the State of Washington, or of any political subdivision of either of them, by revolution, force or violence; . . . .' Refusal so to do 'on any grounds shall be cause for immediate termination of such employee's employment.'

"Appellants brought this declaratory judgment action claiming the Act to be violative of due process as well as other provisions of the Federal Constitution. One of the claims *is* that no hearing is afforded at which the employee can explain or defend his refusal to take the oath. *The Supreme Court of Washington did not pass on this point.* The Attorney General suggests in his brief that prior to any decision thereon here, 'the Supreme Court of Washington should be first given the opportunity to consider and pass upon' it. . . . In the light of these circumstances we cannot say how the Supreme Court of Washington would construe this statute on the hearing point.

"The declaratory nature of the case, the fact that the State's statute here under attack supplements previous statutory provisions raising questions concerning the applicability of the latter, and the principle of comity that should be afforded the State with regard to the interpretation of its own laws, bring us to the conclusion that we must

[1] In our opinion, our recent decision in the case of *Seattle v. Ross, supra,* has no bearing on the issues involved in the present case. The reasons therefor are stated in the dissenting opinion of Mr. Justice Douglas (concurred in by Mr. Justice Black). Furthermore, the Seattle ordinance defined a criminal offense of which Ross was convicted. The instant case is a purely civil proceeding involving the right of a public employee to continue his employment without signing the affidavit required by the statute. The act before us prescribes no presumption that an employee who fails to take the oath is a subversive person. His refusal to answer the required question in affidavit form is ground for discharge from public employment either for incompetency or insubordination or doubtful trust and reliability.

remand the case for further consideration. Cf. Williams v. Georgia, 349 U. S. 375 (1955), [75 S. Ct. 814, 99 L. Ed. 1161]."[2] (Italics ours.)

We have italicized certain words in the foregoing quotation because they have been erroneously construed by some news commentators as implying that this court did not do its full duty in the premises, and that the remand was made necessary because we had negligently failed to decide all the questions before us on the first hearing. We do not so read the *per curiam* decision, but, since the public has been so advised, we wish to take this opportunity to record the fact that (as will more fully appear below) we decided in our original opinion every justiciable issue which was then before us for consideration.

## I.

In order to determine whether the constitutional question, which is the subject of the Supreme Court's opinion, was

---

[2]We have examined the case of *Williams v. Georgia,* to which our attention has been called in the *per curiam* opinion of the Supreme Court. The majority opinion in that case remanded it to the state supreme court to reconsider the extraordinary motion for new trial of a defendant convicted of first degree murder. The final paragraph of the opinion stated the Supreme Court's reasons for remanding the case as follows:

"The facts of this case are extraordinary, particularly in view of the use of yellow and white tickets by a judge of the Fulton County Superior Court almost a year after the State's own Supreme Court had condemned the practice in the *Avery* [*Avery v. Georgia,* 345 U. S. 559] case. That life is at stake is of course another important factor in creating the extraordinary situation. The difference between capital and non-capital offenses is the basis of differentiation in law in diverse ways in which the distinction becomes relevant. We think that orderly procedure requires a remand to the State Supreme Court for reconsideration of the case. Fair regard for the principles which the Georgia courts have enforced in numerous cases and for the constitutional commands binding on all courts compels us to reject the assumption that the courts of Georgia would allow this man to go to his death as the result of a conviction secured from a jury which the State admits was unconstitutionally impaneled. Cf. *Mooney v. Holohan,* 294 U. S. 103."

On the remand, the supreme court of Georgia declined to reconsider the case. *Williams v. State,* 211 Ga. 763, 88 S. E. (2d) 376. The United States Supreme Court then denied a petition for certiorari to review that decision, 350 U. S. 950, 100 L. Ed. 828, 76 S. Ct. 326. A petition for rehearing was subsequently denied by the Supreme Court, 350 U. S. 977, 100 L. Ed. 847, 76 S. Ct. 443.

presented to us for decision at the original hearing in this court, it is necessary to review the record from the beginning.

The professors instituted this action under our declaratory judgment act (RCW 7.24.010 *et seq.*) by filing their complaint, in which they alleged that the action was brought

" . . . for the purpose of testing and determining the constitutionality of the Act, and the right of the defendants [the regents] to establish, enforce, carry out, and administer the provisions thereof through the insistence that plaintiffs and other state employees execute the oath, or otherwise." (Paragraph 9 of the complaint.)

As to their status and rights as state employees to challenge the act, the professors alleged, in paragraphs 1 and 2, that:

"They are residents of King County, Washington, and are presently employed under contract as professors by the University of Washington, hereinafter called the University, an institution of higher learning owned and operated by the State of Washington, through the defendant Board of Regents.

"Through plaintiffs' employment contracts and pursuant to the terms of R.C.W. 28.76 and the rules and regulations of the University, plaintiffs have employment tenure and certain retirement benefits."

The allegations wherein they raised federal questions are found in paragraphs 6 and 7, reading as follows:

"Pursuant to the Act, defendants have demanded that plaintiffs sign and swear to an oath, a copy of which is attached hereto, marked Exhibit 'A'; and unless plaintiffs comply with such demands, their employment contracts with the University will be terminated by the defendants.

"The terms, provisions, and requirements of the Act and the oath are in violation of plaintiffs' rights, privileges and immunities under the Constitution of the United States in the following particulars:

"1. They violate the rights guaranteed under the First Amendment as made applicable to the States by the Fourteenth Amendment;

"2. They violate the rights guaranteed under the Fifth Amendment as made applicable to the States by the Fourteenth Amendment;

"3. They deprive the plaintiffs of their rights without due process of law and deny them the equal protection of the laws as guaranteed by the Fourteenth Amendment; and

"4. They constitute a Bill of Attainder contrary to Article I, Section 10."

The regents, in their answer, denied all the allegations of the complaint above referred to.

After the trial of the cause, the trial court entered certain findings of fact and conclusions of law. The findings which are pertinent to our present inquiry are:

"I. The plaintiffs are residents of King County, Washington, and are presently employed under contract as professors by the University of Washington, hereinafter called the University, an institution of higher learning owned and operated by the State of Washington, through the defendant Board of Regents.

"II. Through the plaintiffs' employment contracts and pursuant to statute and the rules and regulations of the University, plaintiffs have certain tenure rights and certain retirements benefits.

" . . .

"V. All defendants are charged with the duty of establishing, enforcing, carrying out and administering the provisions of Chapter 377, Laws of 1955, hereinafter called the Act, enacted by the Legislature of the State of Washington on March 9, 1955, approved by the Governor on March 21, 1955. The Act provides that each department head in the State of Washington must require that each employee under his charge state under oath whether or not he is a member of the Communist Party or other subversive organization, or upon failure to execute such oath, his employment be terminated.

"VI. Pursuant to the Act, defendants have demanded that plaintiffs sign and swear to an oath, a copy of which is attached to the complaint herein, marked Exhibit A, and have stated that unless the plaintiffs complied with such demands, their employment contracts with the University would be terminated by the defendants."

The trial court, in its conclusions of law, held that the act was invalid because it violated certain provisions of the constitution of the state of Washington, and declared that the professors were entitled to the declaratory relief and the injunction prayed for. No federal question was decided by the trial court.

The final decree granted the following declaratory relief:

"It Is hereby Ordered, Adjudged and Decreed that Chapter 377, Laws of 1955 violates the Constitution of the State of Washington, and is therefore void and of no effect; . . ."

The decree also permanently enjoined the regents from enforcing the act and from requiring the professors to execute any oath pursuant thereto.

From this final decree the regents appealed to this court, and, after our consideration of the briefs and oral arguments, we rendered the unanimous decision of January 29, 1959, referred to above.

In this posture of the case, we turn to a consideration of the first of the three questions set forth above, to wit, whether the professors raised the "hearing" issue either in the trial court or in this court.

We can find nothing in the complaint or elsewhere in the record in the trial court indicating that this issue was ever called to the court's attention. The portions of the record which we have just quoted make it plain that the issue was not raised or considered. The trial court's decree granting declaratory relief to the professors is specifically limited to the basis that the act violated certain provisions of the state constitution. Neither the decree nor the conclusions of law on which it was based mention any federal question whatsoever. The only reference to the United States constitution anywhere in the trial court record is found in the allegations of paragraph 7 of the complaint, quoted above. These allegations raised four points, wherein it was claimed that their rights, privileges and immunities under the United States constitution were impaired by the act and the oath. However, these were general in

scope and nothing was said about the lack of a hearing being one of them.

Parenthetically, there is neither allegation nor finding that the professors have ever refused to take the oath or that they intend to do so in the future. In the absence of such a showing it would seem premature, even in a declaratory judgment action, for a court to rule on a hypothetical situation. At least until the professors show that they have refused to sign the oath, or intend to do so, they are not entitled to demand an administrative hearing on any ground.

## II.

Assuming that when the case first came to this court the professors were in a position to raise the hearing issue, the question remains: What did they do to alert this court at that time as to their contention (now made in the Supreme Court) that the act was violative of the United State constitution upon the ground that no hearing was afforded at which the employee could explain or defend his refusal to take the oath.

In their brief on the last hearing before this court, counsel for the professors frankly stated:

"As to presentation of this basis of unconstitutionality in the appeal to this Court, we acknowledge that in respondents' brief we did not present this with the precision and definiteness that in retrospect we would have liked. But this matter was sufficiently presented in our brief to alert the Court to the problem of procedural due process as applied to the Act. In our brief we cited and discussed *Adler v. Board of Education*, 342 U. S. 485, 96 L. ed. 517, 72 S. Ct. 380, 27 ALR (2d) 472 (1952) (Resp. Br. 23, 24, 27-28, 31, 35, 36, 48, 53, 55); *Slochower v. Board of Education*, 350 U. S. 551, 76 S. Ct. 637, 100 L. ed. 692 (1955) (Resp. Br. 35-36), and *Rudder v. United States*, (C.A. D.C. 1955) 226 F. (2d) 51 (Resp. Br. 21-23). . . ."

It seems to us that, in a case which involved many constitutional issues, both state and federal, the citation of these three cases in connection with *other* points cannot

reasonably be held to be adequate notice that the hearing issue was being relied upon.

In this connection, the professors further assert that, because at that time the validity of another section of the act was also challenged (Section 3, relating to the United States Attorney General's list of subversive organizations), we should have, *sua sponte*, applied to section 4 of the act the rule adopted by the Supreme Court in *Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U. S. 123, 95 L. Ed. 817, 71 S. Ct. 624, relating to the indispensability of hearings.

█ We do not think that we were called upon, after having held that section 3 was invalid, to search the record for other possible applications of the *McGrath* case to situations not called to our attention by counsel. It is the duty of counsel to be specific in presenting their contentions to an appellate court. In the present case, this was not done with regard to the hearing issue until after we had decided the case.

The professors then filed a petition for rehearing in which, for the first time (as far as we were aware), they raised the question of the invalidity of section 4 of the act on the ground that there was no provision for a hearing at which an employee could explain or defend his refusal to sign the oath (if he had refused to do so).

█ This court has for many years adhered to its rule that it will not consider questions presented to it for the first time in a petition for rehearing. *State v. Hazzard*, 76 Wash. 586, 137 Pac. 143 (1913), and cases cited therein.

Were it not for the fact that this case has been remanded to this court by the Supreme Court with the request that we interpret the act with respect to the hearing issue, we would dismiss the professors' claim as not being timely raised. That would, of course, terminate our consideration of the case.

## III.

█ Nevertheless, as a matter of comity, we desire to comply with the Supreme Court's request that we consider the claim that the act does not provide for a hearing

at which the employee can explain or defend his refusal to take the oath. We, of course, limit our consideration of the problem to the facts before us. Even in a declaratory judgment action, there must be a justiciable controversy. *Washington Beauty College v. Huse,* 195 Wash. 160, 80 P. (2d) 403 (1938).

The Supreme Court has also held that the requirements for a justiciable case or controversy are no less strict in a declaratory judgment proceeding than in any other type of litigation.

*Alabama State Federation of Labor v. McAdory,* 325 U. S. 450, 89 L. Ed. 1725, 65 S. Ct. 1384.

*Congress of Industrial Organizations v. McAdory,* 325 U. S. 472, 89 L. Ed. 1741, 65 S. Ct. 1395.

In these two cases the Supreme Court had granted writs of certiorari to review the decisions of the Supreme Court of Alabama in declaratory judgment proceedings instituted to obtain adjudications as to the constitutionality of the Bradford Act (which regulated the conduct of labor unions "functioning" within the state).

The state supreme court had upheld the validity of certain portions of the act (and had held other portions unconstitutional). On reviewing the record in each case, the Supreme Court dismissed the writ of certiorari because there was no concrete set of facts presented to the court to indicate which statutory provisions were to be applied. In dismissing the writ of certiorari in the case first cited above, the Supreme Court said, in a unanimous opinion by Chief Justice Stone:

". . . In advance of an authoritative construction of a state statute, which the state court alone can make, this Court cannot know whether the state court, when called on to apply the statute to a defined case or controversy, may not construe the statute so as to avoid the constitutional question. For us to decide the constitutional question by anticipating such an authoritative construction of the state statute would be either to decide the question unnecessarily or rest our decision on the unstable foundation of our own construction of the state statute which the state court would not be bound to follow. *Spector Motor*

*Co. v. McLaughlin, supra*, [323 U. S. 101] 105; see also *Vandenbark v. Owens-Illinois Co.*, 311 U. S. 538, 543; *Huddleston v. Dwyer*, 322 U. S. 232. Such is not the function of the declaratory judgment.

"The extent to which the declaratory judgment procedure may be used in the federal courts to control state action lies in the sound discretion of the Court. See *Great Lakes Co. v. Huffman, supra* [319 U. S. 293]. It would be an abuse of discretion for this Court to make a pronouncement on the constitutionality of a state statute before it plainly appeared that the necessity for it had arisen, or when the Court is left in uncertainty, which it cannot authoritatively resolve, as to the meaning of the statute when applied to any particular state of facts. In any event the parties are free to litigate in the state courts the validity of the statute when actually applied to any definite state of facts, with the right of appellate review in this Court. In the exercise of this Court's discretionary power to grant or withhold the declaratory judgment remedy it is of controlling significance that it is in the public interest to avoid the needless determination of constitutional questions and the needless obstruction to the domestic policy of the states by forestalling state action in construing and applying its own statutes. See *Great Lakes Co. v. Huffman, supra*, 300, *et seq.*"

The reasoning of the Supreme Court in its opinion dismissing the writ in the second case above cited is seemingly applicable by analogy to the situation presented in the case at bar. The court said:

"Further, the contention that § 16 conflicts with the National Labor Relations Act, cf. *Hill v. Florida, post*, p. 538, was not passed on by the Circuit Court, was not raised by assignment of error in the Alabama Supreme Court, and that court did not pass on that question either in its opinion in this case or in its opinion in the *Alabama State Federation of Labor* case which it adopted as controlling. The Alabama Supreme Court will not consider errors which have not been assigned, *Rowland & Co. v. Plummer*, 50 Ala. 182, 197, *Pettibone-Taylor Co. v. Farmers Bank*, 156 Ala. 666, 46 So. 751; *Malaney v. Ladura Mines Co.*, 191 Ala. 655, 65 So. 666; *Nichols v. Hardegree*, 202 Ala. 132, 79 So. 598; *Halle v. Brooks*, 209 Ala. 486, 96 So. 341, or which have not been specifically and precisely raised in the assignments of error, *Kinnon v. Louisville & Nashville R. Co.*, 187 Ala. 480, 65 So. 397; *Carney v. Kiser Co.*, 200 Ala. 527, 76 So. 853; *Hall v. Pearce*, 209 Ala. 397, 399, 96 So. 608;

*Jackson Lumber Co. v. Butler,* 244 Ala. 348, 13 So. 2d 294, 298. Since the State Supreme Court did not pass on the question now urged, and since it does not appear to have been properly presented to that court for decision, we are without jurisdiction to consider it in the first instance here. *Caperton v. Bowyer,* 14 Wall. 216, 236; *Hulbert v. Chicago,* 202 U. S. 275, 280, 281; *Dorrance v. Pennsylvania,* 287 U. S. 660; *Chandler v. Manifold,* 290 U. S. 665; see also *Flournoy v. Wiener,* 321 U. S. 253; *Charleston Assn. v. Alderson,* 324 U. S. 182, 185, and cases cited."

The material facts shown by the record in the present case as to this hearing issue are that these two professors (who have never refused to take the oath) are presently employed under contract as full professors by the University of Washington, which is operated by the regents. Through their employment contracts, and pursuant to statute and the rules and regulations of the university, they have certain tenure rights.[3] The regents have demanded that the professors sign and swear to an oath (a copy of which is attached to their complaint), and have further stated that, unless the professors complied with such demand, their employment contracts with the university will be terminated by the regents.

This court has very recently held in *Yantsin v. Aberdeen,* 54 Wn. (2d) 787, 345 P. (2d) 178 (1959), that, in the absence of civil service or other tenure rights, public employees may be discharged by their employers without any reason being assigned therefor. There is no vested right to public employment in the state of Washington unless the employee has some tenure rights provided by law. Since the power to discharge is absolute except for such tenure rights, the discharged public employee is not entitled to a hearing regarding the reason for his discharge.

As pointed out in our original decision, the definition of subversive person in the 1951 act was amended in 1953 to provide that a person must have knowledge that an organization is a subversive organization before he can be deemed to be a subversive person. Hence, the element of

---

[3]For applicable rules and regulations regarding tenure rights, see appendix to this opinion. These are discussed later in this opinion.

*scienter* is essential to prove perjury in taking the oath. This interpretation of the act and the oath is now the law of the case. Therefore, the decision in *Wieman v. Updegraff*, 344 U. S. 183, 97 L. Ed. 216, 73 S. Ct. 215, has no application.

It should be further noted that, under the Washington act, there is no inquiry as to past acts or past associations of the employee. The affidavit speaks in the present tense only as of the date the employee takes the oath. If he is now a member of the Communist party or other subversive organization, he may resign today and execute the affidavit tomorrow without incurring any penalty or risking a charge of perjury. Apparently, the New Jersey educational oath statute likewise applies only to the present status of the teacher.[4]

---

[4]The supreme court of New Jersey recently rendered a unanimous decision in the case of *Lowenstein v. Newark Board of Education*, 33 N. J. 277, 163 A. (2d) 156, which concerned one of the same teachers whose dismissal was set aside in *Laba v. Newark Board of Education*, 23 N. J. 364, 129 A. (2d) 273. (We cited the *Laba* case in our original opinion as holding that New Jersey took judicial notice that the Communist party was part of a world conspiracy whose prime objective was the overthrow of the United States government.)

In the *Lowenstein* case, Justice Hall, speaking for the court, referred to the New Jersey educational oath statute as requiring present, not past, allegiance. On this point, the policies of Washington and New Jersey appear to be the same. The opinion stated, in part, as follows:

"Here the inquiry was to aid in determining whether there was sufficient basis to charge that appellant was unfit to teach because subject to the ideologies and disciplines of Communism. Subjection connotes such belief in the overthrow of our government by force or other unlawful means and in the substitution of a totalitarian state with destruction of all of our heritage of individual freedoms as to be subservient to commands to act in any way directed to carry out these nefarious purposes. It is essentially a state of mind, admittedly difficult to determine extrinsically but generally evidenced sufficiently by knowing membership and participation in true Communist organizations and activities designed to further the basic aim of such violent overthrow of our government.

"The focal point of the inquiry in the instant case was such subjection now rather than in the past. It is not suggested by the Board that any past conduct of appellant would be of a nature that in itself would justify dismissal even if there were no present subjection, so we are not called upon to determine under what circumstances, if any, the right to discipline would exist in such a situation and what we are about to say further is directed particularly to the precise situation before us. In fact, the Board's brief specifically says that the 'fit-

■ Instead of being called in by his superior and being asked orally if he belongs to a subversive organization, the legislature has adopted the policy of asking each public employee to state in writing, *i.e.* by affidavit, whether he is at that time a member of such an organization. If he signs the affidavit, that is the end of the matter. If he declines to sign, the employee is subject to immediate discharge. If he has no tenure rights, he has no vested right to public employment, and the act affords him due process. *Nelson v. County of Los Angeles*, 362 U. S. 1, 4 L. Ed. (2d) 494, 80 S. Ct. 527. On the other hand, if he has tenure rights, he must be accorded such a hearing as his contract of employment calls for.

---

ness inquiry . . . involved not only the question of *present* party membership but also the question of *present* subservience to the Party's "ideologies and disciplines" ' (emphasis supplied), and at oral argument the board's counsel expressly agreed with the proposition that no right to dismiss exists merely because a teacher was a member of the Communist Party in the past when it is clear that he is not presently. *Such a view follows state policy as expressed in the educational oath statute* (N.J.S.A. 18:13-9.1 and 9.2) *where the criterion is present allegiance. . . .*" (Last italics ours.)

It should also be noted that the court in that case approved its 1951 decision in *Thorp v. Board of Trustees of Schools for Industrial Education*, 6 N. J. 498, 79 A. (2d) 462 (which we cited in our original decision), stating as follows:

" . . . Passing over the matter of any effect to be given to the fact that the refusal did not extend to all prior event questions, it seems clear that mere alleged invasion of privacy and personal dignity can constitute no bar to an inquiry of this type, if the questions posed are otherwise proper and appropriate. The subject is much too vital today to depend upon such personal views, however sincerely held. The matter is not simply one of academic freedom of thought and expression. As was so well said by Justice Heher in *Thorp v. Board of Trustees of Schools for Industrial Education*, 6 N. J. 498 (1951): 'The maintenance of the purity of the educational process against corruption by subversive influences is of the highest concern to society. . . . Loyalty to government and its free democratic institutions is a first requisite for the exercise of the teaching function. Freedom from belief in force or violence as a justifiable weapon for the destruction of government is of the very essence of a teacher's qualifications.' (at p. 513). See also *Adler v. Board of Education*, 342 U. S. 485, 493, 96 L. ed. 517, 524, 72 S. Ct. 380 (1951). Any concept of individual privilege against intrusion on privacy and conscience must give way in these times and these situations to the greater public interest."

The *Nelson* case involved the dismissal of two county employees because of their refusal to answer questions put to them by a congressional subcommittee concerning subversion. They both had been previously ordered by the county board of supervisors to answer such questions. The California district court of appeal had upheld the discharges and the United States Supreme Court granted certiorari. It should be noted that one employee (Nelson) had a civil service status, and had been given a hearing before the civil service commission; the other (Globe) was a temporary employee and was not entitled to a hearing under the civil service rules.

The decision of the Supreme Court affirmed the discharge of Nelson by an equally divided court. Hence, his case was not discussed in the opinion. As to Globe's discharge, the majority upheld his dismissal for insubordination, three justices dissenting.

Since the majority opinion appears to have a pertinent bearing on the problem presented for decision in this case (especially because of the professors' reliance on the *Slochower* case discussed therein), we quote the following portion of that opinion:

"We, therefore, reach Globe's contention that his summary discharge was nevertheless arbitrary and unreasonable. In this regard he places his reliance on *Slochower v. Board of Education*, 350 U. S. 551 (1956). However, the New York statute under which Slochower was discharged specifically operated 'to discharge every city employee who invokes the Fifth Amendment. In practical effect the questions asked are taken as confessed and made the basis of the discharge.' *Id.*, at 558. This 'built-in' inference of guilt, derived solely from a Fifth Amendment claim, we held to be arbitrary and unreasonable. But the test here, rather than being the invocation of any constitutional privilege, is the failure of the employee to answer. California has not predicated discharge on any 'built-in' inference of guilt in its statute, but solely on employee insubordination for failure to give information which we have held that the State has a legitimate interest in securing. See *Garner v. Board of Public Works of Los Angeles*, 341 U. S. 716 (1951); *Adler v. Board of Education*, 342 U. S. 485 (1952). Moreover it must be remembered that here—unlike *Slo-*

*chower*—the Board had specifically ordered its employees to appear and answer.

"We conclude that the case is controlled by *Beilan v. Board of Education of Philadelphia,* 357 U. S. 399 (1958), and *Lerner v. Casey,* 357 U. S. 468 (1958). It is not determinative that the interrogation here was by a federal body rather than a state one, as it was in those cases. Globe had been ordered by his employer as well as by California's law to appear and answer questions before the federal Subcommittee. These mandates made no reference to Fifth Amendment privileges. If Globe had simply refused, without more, to answer the Subcommittee's questions, we think that under the principles of *Beilan* and *Lerner* California could certainly have discharged him. The fact that he chose to place his refusal on a Fifth Amendment claim puts the matter in no different posture, for as in *Lerner, supra,* at 477, California did not employ that claim as the basis for drawing an inference of guilt. Nor do we think that this discharge is vitiated by any deterrent effect that California's law might have had on Globe's exercise of his federal claim of privilege. The State may nevertheless legitimately predicate discharge on refusal to give information touching on the field of security. See *Garner* and *Adler, supra.* Likewise, we cannot say as a matter of due process that the State's choice of securing such information by means of testimony before a federal body can be denied. Finally, we do not believe that California's grounds for discharge constituted an arbitrary classification. See *Lerner, id.,* at 478. We conclude that the order of the County Board was not invalid under the Due Process Clause of the Fourteenth Amendment."

The Supreme Court also declined to pass upon Globe's contention as to the privileges and immunities clause of the fourteenth amendment, "since it was neither raised in nor considered by the California courts." It seems to us that the quoted phrase is applicable to the professors' contentions regarding the hearing issue in the case at bar.

Before discussing the professors' tenure rights, we desire to refer to two companion cases decided by the Supreme Court on December 12, 1960. They both involved the validity of an Arkansas statute requiring all public school teachers and professors in institutions of higher learning supported by public funds, as a condition precedent to their

employment, to file an affidavit "as to the names and addresses of all incorporated or unincorporated associations and organizations" to which they are presently paying dues or are making contributions, or to which they have paid dues or have made contributions "within the past five years."

One of these cases, *Shelton v. Tucker*, 364 U. S. 479, 5 L. Ed. (2d) 231, 81 S. Ct. 247, was appealed from the decision of a three-judge United States district court, 174 Fed. Supp. 351. The other case, *Carr v. Young*, 231 Ark. 641, 331 S. W. (2d) 701, was an appeal from the decision of the supreme court of Arkansas. The two lower courts upheld the statute and the Supreme Court reversed the decision in each case, four justices dissenting.

The majority opinion held that the Arkansas statute was invalid because it was too broad.

"The question to be decided here is not whether the State of Arkansas can ask certain of its teachers about all their organizational relationships. It is not whether the State can ask all of its teachers about certain of their associational ties. It is not whether teachers can be asked how many organizations they belong to, or how much time they spend in organizational activity. The question is whether the State can ask every one of its teachers to disclose every single organization with which he has been associated over a five-year period. The scope of the inquiry required by Act 10 is completely unlimited. The statute requires a teacher to reveal the church to which he belongs, or to which he has given financial support. It requires him to disclose his political party, and every political organization to which he may have contributed over a five-year period. It requires him to list, without number, every conceivable kind of associational tie—social, professional, political, avocational, or religious. Many such relationships could have no possible bearing upon the teacher's occupational competence or fitness.

" . . .

"The unlimited and indiscriminate sweep of the statute now before us brings it within the ban of our prior cases. The statute's comprehensive interference with associational freedom goes far beyond what might be justified in the exercise of the State's legitimate inquiry into the fitness

and competency of its teachers. The judgments in both cases must be reversed."

Two separate opinions were written, in both of which all four dissenting justices joined. Mr. Justice Harlan stated in his dissent:

" . . . Where official action is claimed to invade these rights [free speech and association], the controlling inquiry is whether such action is justifiable on the basis of a superior governmental interest to which such individual rights must yield. When the action complained of pertains to the realm of investigation, our inquiry has a double aspect: first, whether the investigation relates to a legitimate governmental purpose; second, whether, judged in the light of that purpose, the questioned action has substantial relevance thereto. See *Barenblatt v. United States*, 360 U. S. 109; *Uphaus v. Wyman*, 360 U. S. 72.

"In the two cases at hand, I think both factors are satisfied. It is surely indisputable that a State has the right to choose its teachers on the basis of fitness. And I think it equally clear, as the Court appears to recognize, that information about a teacher's associations may be useful to school authorities in determining the moral, professional, and social qualifications of the teacher, as well as in determining the type of service for which he will be best suited in the educational system. See *Adler v. Board of Education*, 342 U. S. 485; *Beilan v. Board of Public Education*, 357 U. S. 399; see also *Slochower v. Board of Education*, 350 U. S. 551. Furthermore, I take the court to acknowledge that, agreeably to our previous decisions, the State may enquire into associations to the extent that the resulting information may be in aid of that legitimate purpose. These cases therefore do not present a situation such as we had in *N.A.A.C.P. v. Alabama*, 357 U. S. 449, and *Bates v. Little Rock*, 361 U. S. 516, where the required disclosure bears no substantial relevance to a legitimate state interest.

"Despite these considerations this statute is stricken down because, in the Court's view, it is too broad, because it asks more than may be necessary to effectuate the State's legitimate interest. Such a statute, it is said, cannot justify the inhibition on freedom of association which so blanket an inquiry may entail. Cf. *N.A.A.C.P. v. Alabama, supra; Bates v. Little Rock, supra.*"

We note parenthetically that the Arkansas statute does not provide for a hearing at which the teacher or the pro-

fessor may explain or defend his refusal to file the required affidavit, nor is there any reference in any of the opinions as to any constitutional necessity therefor.

The Washington statute involved here is tailored to the legislative determination as to what is necessary in the premises to protect the state and its educational institutions from activities of subversive persons who are being financially maintained by the state and its municipalities. Unlike the Arkansas statute, our act is not too broad in its scope.

The Supreme Court, in remanding this case, has in effect asked us to construe the subversive activities act of 1951 (as amended in 1953 and in 1955) with reference to the hearing issue.

Since the professors in the present case (as the trial court found) are employed by the regents under contract as full professors and have certain tenure rights, we must construe the subversive activities act in the light of the tenure rights which they possess under the rules and regulations adopted by the regents. The pertinent portions of these rules and regulations are set forth in the appendix to this opinion.

Briefly stated, the tenure rights of a professor include the right to be given written notice of the alleged grounds for his discharge from his position, a "trial" before a standing committee composed of eleven members of the faculty known as the tenure committee, the right to be represented by any person of his choice, the right to be present during the taking of testimony, to call witnesses, and to cross-examine opposing witnesses. The procedure prescribed in the rules and regulations for the conducting of the hearing is substantially the same as an accused person ordinarily would receive in a court of law, except a jury trial.

The committee, at the conclusion of the hearing, makes written findings and recommendations, which, together with a transcript of the testimony, are filed with the president of the university (who also attends the hearing but not the deliberations of the committee).

A professor may be removed from his position only "for cause," which is defined as one or more of the following reasons: (1) Incompetence, (2) neglect of duty, (3) physical or mental incapacity, (4) dishonesty or immorality, (5) conviction of a felony.

The president, after reviewing the findings and recommendations of the tenure committee, makes his decision as to whether or not a cause for removal has been established in a particular case and reports to the regents.

 We are of the opinion that the provision in the subversive activities act to the effect that refusal to take the oath "on any grounds" shall be cause for "immediate termination of employment," should not be interpreted in the case before us as meaning that a full professor having tenure rights under his contract of employment is deprived of the right to a hearing as provided in the rules and regulations of the university. In other words, if the professors should refuse to sign the affidavit (which they have not yet refused to do), they, in our opinion, will be entitled to the hearing before the tenure committee and to the other procedures relating to termination of employment prescribed in the university's rules and regulations, set forth in the appendix to this opinion.

Counsel for both parties, in their respective briefs (filed subsequent to the last argument in this court), referred to the hearing provided for in § 15 of the 1951 act (RCW 9.81.090). In our opinion, this hearing provision does not apply to persons refusing to sign the oath, because, under Laws of 1957, chapter 377, § 1 (which amends § 12 of the 1951 act), refusal by a public employee or applicant for public employment to sign the oath on any grounds shall be cause for immediate termination of such employment or refusal to accept an application therefor.

Declining to take the oath does not stamp a public employee as a subversive person. There is no stain of disloyalty attached thereto. If he does not wish to sign the oath, he may seek private employment. On the other hand, if he takes the oath and subsequently his superior has bona fide grounds for investigating his qualifications (including

a charge that he is a subversive person), then such employee is entitled to a hearing as provided in § 15 of the 1951 act. Such a hearing was afforded in the *Beilan, Lerner, Nelson* and *Lowenstein* cases, *supra.*

We conclude that the professors are not entitled to a hearing under § 15 of the 1951 act, but, as stated above, are entitled to a hearing before the tenure committee, because the rules and regulations adopted by the regents (which form a part of their contracts of employment) so provide.

██ The regents have urged, in their reply brief, that the professors are entitled to a hearing under the model state administrative code (Laws of 1959, chapter 234, RCW 34.04.010 *et seq.*), citing *Wong Yang Sung v. McGrath,* 339 U. S. 33, 94 L. Ed. 616, 70 S. Ct. 445. However, we are of the opinion that this 1959 statute was not intended to supersede established procedure adopted by the regents pursuant to RCW 28.77.120 and 28.77.130. There is nothing in the administrative code which indicates to us a legislative intent to amend or repeal the statutes relating to the operation of the University of Washington which have been in effect for fifty years.

Pursuant to the mandate of the Supreme Court received by this court June 13, 1960, we construe the 1951 subversive activities act of this state (as amended), with reference to the question of whether it affords a hearing to the professors in this case at which they may explain or defend their refusal to take the oath required by the act, as follows:

Assuming (a) that the professors timely raised this hearing issue in the Washington courts, and (b) that they have refused to take the oath or have proved that they will refuse to do so, we are of the opinion that, before they can be discharged for such refusal, the professors, under their contract of employment, are entitled to a hearing before the tenure committee conducted in the manner prescribed in the applicable rules and regulations adopted by the regents (see appendix) for the termination of the

tenure of full professors employed by the University of Washington.

As to all other issues involved in this case, we adhere to the views expressed in our original opinion of January 29, 1959; and reported in 53 Wn. (2d) 460, 335 P. (2d) 10.[5 & 6]

Pursuant to the mandate of the Supreme Court, we direct that the clerk of this court forthwith transmit to that court a certified copy of this opinion.

HILL, WEAVER, ROSELLINI, OTT, FOSTER, and HUNTER, JJ., concur.

---

[5]Other decisions of the Supreme Court which have been rendered since our original decision of January 29, 1959, and have a bearing on the questions decided therein are: *Barenblatt v. United States*, 360 U. S. 109, 3 L. Ed. (2d) 1115, 79 S. Ct. 1081; *Uphaus v. Wyman*, 360 U. S. 72, 3 L. Ed. (2d) 1090, 79 S. Ct. 1040; *Uphaus v. Wyman*, 364 U. S. 388, 5 L. Ed. (2d) 148, 81 S. Ct. 153; *Wilkinson v. United States*, 365 U. S. 399, 5 L. Ed. (2d) 633, 81 S. Ct. 567; *Braden v. United States*, 365 U. S. 431, 5 L. Ed. (2d) 653, 81 S. Ct. 584.

[6]The dissenting opinion (see below), as we read it, implies that the rights of all state employees, in addition to those of the two professors who instituted this action, should be considered in this opinion. Those questions are not before us. In the first place, the professors alleged, and the trial court found, that they had employment contracts and that, under the rules and regulations of the university, they had tenure rights. Secondly, the mandate of the Supreme Court directed us to pass on the professors' claim "that no hearing is afforded at which the employee can explain or defend his refusal to take the oath." Thirdly, neither the briefs nor the arguments of counsel in either of the two hearings before this court have made any reference to the rights of any of the thousands of public employees (state, county, and municipal) whose rights are governed in each particular category by the provisions of other statutes or city charters which have not even been mentioned in this litigation.

We have answered the only question involved in this case which has been referred to us for answer by the Supreme Court.

The dissent refers also to the proscribed organizations named by the United States attorney general. These organizations have not been involved in this case since our original opinion (*Nostrand v. Balmer*, 53 Wn. (2d) 460, 471) was filed over two years ago. We there held, in a *unanimous* opinion, that section 3 of the act (which attempted to adopt as proscribed subversive organizations those named by the attorney general) was unconstitutional for three reasons. No appeal was taken from that part of our judgment, so under the law of the case the attorney general's list of proscribed organizations cannot be considered again.

APPENDIX

EXCERPTS FROM CHAPTER 25, PART II OF
THE FACULTY HANDBOOK

UNIVERSITY OF WASHINGTON (1956)

TENURE OF THE FACULTY

"Section 2501. Statute Relating to Tenure

" '[The Board of Regents] shall have full control of the university . . . and shall employ the president, members of the faculty, assistants and employees of the institution, who shall hold their positions during the pleasure of said Board of Regents.' [See RCW 28.77.130(1)].

"Reference: see Section 1102.

"Section 2511. Statement of Policy by the Board of Regents

"The University of Washington Regents accept in principle the concept that tenure for members of the faculty is essential for effective teaching and sustained productivity in scholarship.

"They furthermore accept in principle the concept that the privilege of a faculty member to hold his position without discriminatory reduction in salary, and not to be removed therefrom, should not be abrogated except for cause and through orderly administrative processes, maintaining and retaining, however, the responsibilities and obligations of the Board of Regents as defined in the laws of the state of Washington.

"*Resolution of the Board of Regents, October 16, 1954 as amended May 19, 1956.*

"Section 2531. Definition of Tenure

"Tenure is the right of a faculty member to hold his position without discriminatory reduction of salary, and not to suffer loss of such position, or discriminatory reduction of salary, except for the reasons and in the manner provided in this Chapter.

"Section 2532. Criteria for Tenure

"A. Unless he is disqualified under any other provision of this section, a full-time member of the faculty has tenure if—

"1. he is a professor or associate professor. . . .

"Section 2541. Granting of Tenure: Policy and Procedure

"A. Tenure should be granted to faculty members of such character and scholarly ability that the University, so far as its resources permit, can justifiably undertake to employ them for the rest of their academic careers. Such a policy requires that the granting of tenure be considered

carefully. It should be a specific act, even more significant than promotion in academic rank, which is exercised only after careful consideration of the candidate's scholarly qualifications and character. . . .

"Section 2551. Grounds for Removal of Persons with Tenure

"A. Faculty members having tenure under the provisions of this Chapter may be removed from their positions or subjected to discriminatory reduction of salary for one or more of the following reasons:

"1. Incompetence
"2. Neglect of duty
"3. Physical or mental incapacity
"4. Dishonesty or immorality
"5. Conviction of a felony

Such a removal is termed 'a removal for cause.'

"B. Upon reorganization within the University for budgetary reasons or for reasons of educational policy, faculty members having tenure under the provisions of this Chapter may be removed from their positions, provided

"1. that the reorganization, in its relation to principles of tenure, is a reasonable procedure under the circumstances calling for it, and

"2. that every reasonable possibility of placing such persons in other University employment with tenure has been exhausted.

Such a removal is termed a 'removal for reorganization.' In proceedings to effect a removal for reorganization, the rules of procedure prescribed in Section 2562 shall be followed, but the Tenure Committee shall not consider the merits of the reorganization as budgetary or educational policy beyond determining its reasonableness in relation to principles of tenure.

"Section 2552. Necessity for Hearing in Tenure Proceedings

"No faculty member having tenure as defined in this Chapter shall be removed from his position or subjected to discriminatory reduction of salary until he has been given opportunity for a hearing as prescribed by Section 2562.

"Section 2561. The Tenure Committee

"There shall be a standing committee of the faculty known as the Tenure Committee which shall be composed of eleven faculty members appointed by the Senate. All members of this committee shall be persons having tenure as defined in this Chapter.

"Section 2562. Procedure of the Tenure Committee

"A. To institute proceedings before the Tenure Committee under the requirement of Section 2552, the dean

of the college or school in which the faculty member in question is employed shall sign and present a written statement to the chairman of the Tenure Committee. This written statement shall set forth all grounds for the proposed removal of the faculty member from his position or the proposed discriminatory reduction of his salary. If no such action is taken by his dean, a faculty member subject to removal from his position or to discriminatory reduction of salary may institute proceedings before the Committee by a written statement, signed and presented in the same manner, which shall set forth his grounds for opposing the action taken or impending against him.

"B. Upon receipt of such a written statement from the dean, the chairman of the committee shall cause a copy of it to be delivered or mailed to the faculty member affected by the proposed action. Upon receipt of such a written statement from a faculty member, the chairman shall cause a copy of it to be delivered or mailed to the dean of the faculty member's college or school.

"C. Within twenty days after delivery or mailing of a copy of the written statement, the person to whom it has been delivered or mailed shall present to the chairman of the committee a written answer containing such admissions, denials, or other relevant statements as he deems appropriate. Upon receipt of this written answer, the chairman of the committee shall cause a copy of it to be mailed or delivered to the signer of the written statement.

"D. Upon receipt of the written answer or upon default thereof, the committee shall fix a date for hearing and advise the signer of the written statement and the person to whom the copy thereof was served of the time and place at which the matter will be heard by the committee.

"E. Hearings of the Tenure Committee are governed by the rules prescribed below.

"1. No member of the committee shall sit in a case which involves a member of his department or of his college or school if it is not departmentalized. If a committee member is so disqualified, the Senate upon recommendation of the Committee on Committees shall appoint a faculty member having tenure to act in place of the disqualified member.

"2. Since judgment must be passed by the President, it is desirable that the President, who is *ex officio* a member of all committees, sit with the committee as an auditor, but, because he must judge the findings and

recommendations, he shall not be present at the final deliberations.

"3. At the hearing a majority of the committee constitutes a quorum.

"4. Each party to the hearing is entitled to representation by any person of his choice. Each party shall be confronted by the witnesses, shall have the privilege of being present at all committee sessions when testimony is being heard, and shall have the right to call witnesses, produce relevant documents, and cross-examine opposing witnesses.

"5. If the hearing involves any charge of professional incompetence on the part of a faculty member, testimony of scholars in his field, whether within or without the University, shall be considered if offered.

"6. A full stenographic record of the hearing shall be made and shall be available to all parties concerned:

"7. At the conclusion of the hearing, the committee shall promptly make written findings and recommendations, the original of which, together with the transcript of testimony at the hearing, shall be filed with the President. Copies of the findings and recommendations shall be sent to each party to the hearing.

"8. The hearing shall be conducted according to such supplementary rules as the committee may establish. The committee shall be guided, but not necessarily bound, by the rules of evidence observed in courts of law."

FINLEY, C. J. (concurring specially)—The United States Supreme Court has remanded this case to us to answer one and only one question. No plethora of rhetoric or logic can change this fact. The Court merely wants to know whether the state act (Laws of 1955, chapter 377 (RCW 9.81.070)), as construed or evaluated by our state supreme court, gives to Professors Nostrand and Savelle a right to a hearing before termination of employment if they refuse to execute the oath prescribed by the act.

The opinion written for the majority by Donworth, J., states unequivocally that the state subversive activities act, *supra,* does not in and of itself provide a right to a hearing. However, the majority opinion states with equal vigor that, in any event, the professors, as individual employees of

the University, would be entitled to a hearing before the tenure committee under the tenure provisions of their employment contract and regulations of the University of Washington pertaining thereto.

I agree with the majority on both scores.

MALLERY, J. (dissenting)—The Supreme Court of the United States vacated the judgment and remanded the cause to this court in order to ascertain whether or not the act by our interpretation affords a hearing to an employee in which he can explain or defend his refusal to take the oath.

Accordingly, the purpose of the instant opinion of this court is to decide whether or not the act contemplates such a hearing and to inform the United States Supreme Court of our decision.

Implicit in the remand is the implication that, if we hold that such a hearing is not afforded by the act, it is "violative of due process."

The act requires every public employee to answer, under penalty of perjury, whether or not he is a subversive person by reason of being a member of the Communist party or any of the organizations designated as subversive by the attorney general of the United States pursuant to executive order No. 9835. The penalty for refusing to take the oath is immediate discharge.

The act contains no language that can be interpreted as providing for a hearing of any kind. Nothwithstanding this, the majority opinion has met the issue posed by the United States Supreme Court remand by holding the act does afford the kind of a hearing contemplated by the United States Supreme Court. To reach this conclusion, the majority opinion assumes that the hearing available to teachers before discharge under unrelated teacher tenure statutes constitutes due process of law to public employees. I do not agree.

It happens that the respondents are teachers, and teachers do comprise part of the public employees in this state. The majority opinion does not hold that *other* employees can

have a *tenure* hearing under the teacher tenure statute, or that even a teacher in a tenure act hearing can explain his refusal to take the oath as a defense to discharge under either the act in question or the teacher tenure act. I quote from the majority opinion:

"Instead of being called in by his superior and being asked orally if he belongs to a subversive organization, the legislature has adopted the policy of asking each public employee to state in writing, *i. e.* by affidavit, whether he is at that time a member of such an organization. If he signs the affidavit, that is the end of the matter. If he declines to sign, the employee is subject to immediate discharge. If he has no tenure rights, he has no vested right to public employment, and the act affords him due process. *Nelson v. County of Los Angeles*, 362 U. S. 1, 4 L. Ed. (2d) 494, 80 S. Ct. 527. On the other hand, if he has tenure rights, he must be accorded such a hearing as his contract of employment calls for."

Teachers' contract rights do not exclude teachers from the operation of the act in question, the mandate of which is absolute in nature. Explanation of the refusal to take the oath would not, therefore, constitute a defense to discharge in a tenure hearing. I think due process requires an opportunity to defend, not merely to make a prejudged futile statement.

While the avowed purpose of the act is to shield the sovereignty of the states from forcible overthrow, an intended result is that the public pay roll shall not be available to persons believing the principles of the Communist party or of the proscribed organizations named by the United States attorney general.

The act does not permit an affiant to put any qualifications or limitations in his affidavit. As the majority opinion says: "If he signs *the* affidavit, that is the end of the matter. If he declines to sign, the employee is subject to immediate discharge." (Italics mine.)

The scienter mentioned in the original opinion of this court does not relate to the accuracy of affiant's knowledge of the organizations or the completeness of his agreement with their tenets. It only goes to affiant's mental competence

and his awareness of what acts constitute joining and being a member of the organizations in question.

The body of the act constitutes a rule of evidence, *viz.*, that membership in the proscribed organizations constitutes unrebuttable proof of a state of mind. In this respect, it harks back to the theory of the ancient crime of "Imagining the death of the King," which was committed by a state of mind without the commission of an overt act. Thus, a public employee is coerced to reveal his abstract secret thoughts under penalty of instant discharge. Scopes was convicted of *teaching* Darwinism. Under the instant kind of a law, he could be convicted for refusing to reveal his secret belief in Darwinism.

If by due process of law the Supreme Court of the United States means the right and opportunity of a member of the proscribed organizations to defend himself on the ground that he personally and individually does not, in fact, believe in the forcible overthrow of the government, and that he contemplates no overt act to accomplish such a result, our answer to the remand should be that the act affords no such hearing and permits no such defense. I do not agree with the majority opinion's representation to the contrary.

I dissent.

---

June 8, 1961. Petition for rehearing denied.