[No. 35436.   *En Banc.*   September 29, 1961.]

JOHN J. O'MEARA et al., *Respondents,* v. THE WASHINGTON STATE BOARD AGAINST DISCRIMINATION, *Appellant,* RAYMOND D. TORBENSON et al., *Defendants,* ROBERT L. JONES, *Intervenor.**

The *Attorney General, Philip R. Meade, Wing Luke,* and *Elihu Hurwitz, Assistants,* for appellant.

*George J. Toulouse, Jr.* (*Richard M. Thatcher,* of counsel), for respondents.

*Robert W. Winsor, Howard P. Pruzan,* and *Marvin B. Durning,* for intervenor.

*Benjamin S. Asia, Philip L. Burton, Sam L. Levinson, Solie M. Ringold, Toru Sakahara, Leonard W. Schroeter, Charles Z. Smith, David J. Smith, Fredric C. Tausend, Garvin, Ashley & Foster, Paul P. Ashley, Wilbur J. Lawrence,* and *Byron D. Coney, amici curiae.*

*Reported in 365 P. (2d) 1.

FOSTER, J.—This is an appeal by the Washington State Board Against Discrimination from a final judgment holding null and void an order of the appellant requiring John J. O'Meara and his wife to sell their home to the intervenor, Robert L. Jones, who is a Negro.

The constitutionality of the 1957 amendment to the law against discrimination is presented. Laws of 1957, chapter 37, § 3, p. 108, RCW 49.60.030, declares freedom from discrimination on account of race, creed or national origin to be a civil right and that it shall include the right to secure publicly-assisted housing without discrimination. The text of the statute is:

"The right to be free from discrimination because of race, creed, color, or national origin is recognized as and declared to be a civil right. This right shall include, but not be limited to:   . . .
"(3)   The right to secure publicly-assisted housing without discrimination."

By the express terms of the 1957 amendment, the power of the appellant board to order a sale is limited to those owners offering their homes for sale while a loan from a Federal or state agency remains unpaid or while there is a commitment for such a loan. The statute gives the board no power to require an owner to sell to any particular person under any other circumstances. That is to say, as soon as such a loan is paid, the board's power in the premises is at an end.

The statute is:

" 'Publicly-assisted housing' includes any building, structure or portion thereof which is used or occupied or is intended to be used or occupied as the home, residence or sleeping place of one or more persons, and the acquisition, construction, rehabilitation, repair or maintenance of which is financed in whole or in part by a loan, whether or not secured by a mortgage, the repayment of which is guaranteed or insured by the federal government or any agency thereof, or the state or any of its political subdivisions, or any agency thereof, *provided that such a housing accommodation shall be deemed to be publicly-assisted only during the life of such loan and such guarantee or*

*insurance, or if a commitment, issued by a government agency, is outstanding that the acquisition of such housing accommodations may be financed in whole or in part by a loan, whether or not secured by a mortgage, the repayment of which is guaranteed or insured by the federal government or any agency thereof, or the state or any of its political subdivisions, or any agency thereof;*" Laws of 1957, chapter 37, § 4, p. 109, 111. (Italics ours.)

The trial judge favored this court with a painstaking written opinion in which the facts are fairly stated as follows:

"The petitioner John J. O'Meara is a Commander in the United States Coast Guard. He and his wife own a single-family residence at 3004 East 70th Street, Seattle, Washington. In the early spring of this year, Commander O'Meara received orders transferring him to Washington, D. C. He placed his Seattle home on the market by running an advertisement in the Seattle Times and by posting 'For Sale' signs on his front lawn and at other places in the neighborhood. He did not list it for sale with any real estate broker as he intended to deal directly with prospective purchasers.

"The complainant, Robert L. Jones, is a Negro, employed by the United States Postal Service. On Sunday, April 19th, Mr. and Mrs. Jones and some friends visited and inspected the O'Meara home. On Tuesday, April 21st, complainant's attorney went to the O'Meara home and left with Mrs. O'Meara a signed earnest money receipt contemplating a sale for $18,000, 'all cash to seller on closing.' The earnest money receipt was accompanied by a check for $1,000 as a down payment. These documents were left with Mrs. O'Meara over her protest. On April 22, they were returned to complainant's attorney by Commander O'Meara.

"Mr. Jones lodged a complaint with the Washington State Board Against Discrimination, which followed the statutory administrative procedure by convening a hearing tribunal, which sat on Saturday, April 25th. The hearing consumed approximately eleven hours and the transcript of the testimony runs to 300 pages. Seven witnesses were heard. Thereafter, the hearing tribunal filed its opinion, findings of fact, and order. The hearing tribunal found, as a fact, that the O'Mearas had refused to sell their home to complainant because of his color, and that such refusal

constituted an unfair practice as defined in RCW 49.60-.217.

"The home in question is approximately 24 years old. The O'Mearas bought it in 1955. It was financed through a private loan insured by the Federal Housing Administration, which hereafter in this opinion will be referred to as FHA. The law against discrimination under the authority of which the hearing tribunal sat, insofar as it applies to houseing, was not enacted until 1957.

"For the purposes· of this opinion, it will be assumed that the hearing tribunal was correct in finding that the O'Mearas had refused to sell their home to complainant because of his color. . . ."

Judge Hodson admirably stated the evils of housing discrimination in the following paragraph:

"This court is fully cognizant of the evils which flow from discrimination because of race, creed, or color in a free democratic society. The practice of discrimination is utterly inconsistent with the political philosophy upon which our institutions are based and with the moral principles which we inherit from our Judeo-Christian tradition. Its effects, in terms of social, economic and psychological damage to the community, are well known. Segregated housing, in particular, is linked intimately with substandard, unhealthy, unsafe living conditions with resultant fire and health hazards. It undoubtedly contributes to instability in family life, moral laxity, and delinquency. It can and must be eliminated, not only in order that the members of our minority groups may reach their full potential but also in order that the majority may be brought to act in a manner consistent with the principles which they profess. It may be noted also that elimination of discrimination is necessary for the sake of America's relations with the rest of the world. Our standing with the so-called uncommitted peoples of the world suffers seriously because of the continued discrimination and segregation practiced in America."

The trial court reviewed the two other decided cases presenting related problems as follows:

"*New York State Commission Against Discrimination vs. Pelham Hall Apartments, Inc., et al.,* [10 Misc. (2d) 334, 170 N. Y. S. (2d) 750 (1958),] is Index No. 8642/1957 in the Supreme Court of the State of New York for Westchester County. The Commission Against Discrimination

had ordered the respondents not to discriminate in the leasing of apartments in alleged publicly-assisted housing. The respondents were the owners of a multiple-apartment dwelling. They refused to lease an apartment to one Shervington, a Negro. They admitted that their refusal was because of his race. The FHA commitment had been made on June 30, 1955, and the effective date of the New York statute was the following day, July 1st. It is to be noted that the New York statute is prospective only. It does not, as the Washington statute purports to do, apply to housing which was publicly assisted before its effective date. The bank advances which were made on account of the insured loan during construction of the project all came subsequent to the effective date of the act. It is to be noted also that the New York statute applies only to multiple dwellings or housing projects of ten or more contiguous houses. In the circumstances, the court had no difficulty in finding the respondents' property to be publicly assisted. On the constitutional question, the court recognized that the legislation could be justified only if it was determined that it was a valid exercise of the police power. It was held that the act was a valid exercise of the police power, and that its limitation to the specified classes of housing and to housing which became publicly assisted after July 1st, 1955, was a reasonable classification or at least was not so arbitrary and unreasonable as to be in violation of the equal-protection clauses. Accordingly, the application of the Commission to enforce its order against the respondents was granted.

"   .   .   .

"*Levitt & Sons, Inc., vs. Division Against Discrimination* is No. A-334-58 in the Appellate Division of the Superior Court of New Jersey, decided July 22, 1959 [since affirmed by the supreme court of New Jersey, 31 N. J. 514, 158 A. (2d) 177]. In that case, the plaintiff appellant was the developer of approximately 16,000 one-family houses in a project known as Levittown. Its coplaintiff, Greenfield's Farm, Inc., was the developer of approximately 600 houses in Greenfield's Village. The FHA had committed itself to insure mortgages made by purchasers. It was necessary for FHA to approve the site and to lay down requirements concerning drainage, street layouts, parks, curbs, sidewalks, utilities, including water and sewage disposal, and such improvements as top soil, streets, trees, driveways, entrance walks, finish grade, etc. Individual applications were processed by the architectural valuation and mort-

gage credit sections in the Chief Underwriter's Office. During the course of the construction, FHA inspectors made periodic inspections. In fact, at Levittown a full-time FHA inspector was employed. The court concluded that the plaintiffs would not have undertaken the developments if they had not been assured of the availability of FHA financing and, accordingly, in view of the large scale and intimate connection of FHA with the developments, the court had no difficulty in concluding that they were 'publicly assisted.' "

It is to be noted that the decision in the New York case was by a trial court whose decision is not binding precedent.

The power of the legislature to vest the appellant board with authority to order any or all owners to sell their homes to particular persons is not presented.

But on the contrary, the only question is: Can the state constitutionally compel a home owner to sell his home to one designated by a state administrative agency solely because such home owner has not paid a public loan or a loan guaranteed by a Federal or state agency while immunizing all other home owners from such coercive powers?

■ We affirm the judgment holding the statute unconstitutionally discriminatory under the equal protection clause of the fourteenth amendment to the Federal constitution and the privileges and immunities clause of Art. I, § 12, of the state constitution.

The reasons stated by Judge Hodson therefor are adopted as the opinion of this court.

Judge Hodson's words are:

" . . . It may very well be that, if the FHA itself had had a regulation, at the time he obtained his loan, declaring that those who took advantage of FHA benefits would thereby be prohibited from discriminating in the eventual sale of the property, such regulation would be valid and binding. He would then have had the choice of accepting FHA financing with such limitation, or obtaining private financing without FHA. In this case, the house was built long before there was any FHA, and Commander O'Meara obtained his loan two years before the effective date of the antidiscrimination law. In the

circumstances, it can hardly be argued that he voluntarily assumed any limitations at the time he obtained his loan.

. . .

"One further question remains: Is the classification created by the act reasonable? It applies only to 'publicly-assisted' property.

"Mr. Justice Holmes, in *Patsone vs. Pennsylvania,* 232 U. S. 138 (1914), had the following to say on the subject:

"'We start with the general consideration that a State may classify with reference to the evil to be prevented, and that if the class discriminated against is or reasonably might be considered to define those from whom the evil mainly is to be feared, it properly may be picked out. . . . It is not enough to invalidate the law that others may do the same thing and go unpunished, if, as a matter of fact, it is found that the danger is characteristic of the class named. . . . The question therefore narrows itself to whether this court can say that the (legislature) was not warranted in assuming as its premise for the law that (the class which the law singles out was) the peculiar source of the evil that it desired to prevent.'

"There is no reason to suppose that persons with FHA mortgages on their homes are more likely to discriminate against minority groups than those who have conventional mortgages or no mortgages, or those who are purchasing upon contract. This act would prohibit Commander O'Meara from doing what his neighbors are at perfect liberty to do. It gives to those who have conventional mortgages, or no mortgages, and those who are buying upon contract, special privileges and immunities which are not accorded to him. The classification is arbitrary and capricious and bears no reasonable relation to the evil which is sought to be eliminated. It not only violates the equal protection clause of the 14th Amendment to the United States Constitution, but violates the special privileges and immunities clause of Article I, Section 12, of the Washington State Constitution."

The judgment appealed from is affirmed.

DONWORTH and WEAVER, JJ., concur.

MALLERY, J. (concurring)—The respondents refused to sell their home to a Negro, and, when the Washington State Board Against Discrimination (hereinafter called the board) ordered them to do so, they appealed to the superior court.

The trial court, upon the appeal, held that Laws of 1957, chapter 37, p. 107 (hereinafter referred to as *the act*), which created the board and gave it the power to order the sale of private property to a Negro, was unconstitutional. The board, in its capacity as a party litigant, then appealed to this court the trial court's reversal of its own order, which it had issued in its role as a tribunal.

## I.

The respondent's home, which was ordered sold to a Negro, is specifically protected against such an order by amendment 9 of the Washington state constitution, which provides, *inter alia*:

"*Private* property shall not be taken for *private* use, except for private ways of necessity, and for drains, flumes, or ditches on or across the lands of others for agricultural, domestic, or sanitary purposes. . . ." (Italics mine.)

The act of the legislature is invalid because it derogates from this constitutional right. The legislature attempted to evade the prohibition of the constitution by using an arbitrary classification of private homes, which it designated as *publicly-assisted housing*. This was done in recognition of the fact that the ninth amendment is not applicable to government institutions. It then proceeded to subject private homes to forced sales to private people on the assumption that it could treat private homes as public institutions if it called them by some phrase having the word *public* in it. The arbitrary classification of *publicly-assisted housing* is found in RCW 49.60.010, which provides, *inter alia*:

". . . A state agency is herein created with powers with respect to elimination and prevention of discrimination . . . in *publicly assisted housing* because of race, creed, color, or national origin; . . ." (Italics mine.)

That the classification *publicly-assisted housing* does not mean government financed slum clearance projects (with which the act is not concerned), government housing projects, or any other conceivable form of housing owned, operated, regulated, or controlled by the government is

clearly established by the way the act itself defines the phrase *publicly-assisted housing.* RCW 49.60.040 provides, *inter alia:*

" . . .

" 'Publicly-assisted housing' includes any building . . . used . . . as the home . . . of one or more persons, . . . which is financed in whole or in part by a loan, . . . the repayment of which is guaranteed or insured by the federal government . . . or the state . . . during the life of such loan . . ."

The theory of the act that F. H. A. financing converts a private home into a public institution is a palpable subterfuge to violate the clear mandate of the ninth amendment to the state constitution.

The constitutional question posed by this case is simply this: Can a *private* person, Negro or white, compel any owner to sell his *private* home to him? The act in question says that he can. The answer of the ninth amendment of the state constitution, quoted above, is an unequivocal *no.* The personal characteristics of the home owner and would-be buyer are irrelevant to the constitutional protection of private property, which is absolute.

The act violates the ninth amendment of the state constitution and is, therefore, invalid.

II.

The tribunal's order that the respondents sell their home to a Negro involves the title and possession of real property. The act purports to confer jurisdiction upon the board and tribunal to make the adjudication embodied in the order applicable to real property.

This is violative of Art. IV, § 6, of the state constitution, which provides, *inter alia:*

"The superior court shall have *original jurisdiction* in all cases . . . which involve the title or possession of real property, . . ." (Italics mine.)

A real property owner has a constitutional right to have his title and possessory rights to real property adjudicated in the superior court in the *first instance.* It is apparent that

the act purports to relegate the superior court to an appellate jurisdiction and to confer *original* jurisdiction upon the board-tribunal for the purpose of ordering the sale of real property to Negroes.

None of the inferior tribunals in this state can exercise *any* jurisdiction whatever over the title and possession of real property for the inescapable reason that they have no *original jurisdiction* over real property in particular and no *appellate* jurisdiction of any kind.

The act ignores and violates the state constitution in its attempt to confer original jurisdiction upon the board and thereby relegate the superior court to an *appellate* jurisdiction. This is done specifically in RCW 49.60.270, which provides for " . . . a review of such order in the superior court . . ." It further emphasizes the appellate nature of the superior court's jurisdiction in RCW 49.60.260, which provides that, upon appeal from the tribunal's order to the superior court,

" . . .

" (2) The findings of the hearing tribunal as to the facts, if supported by substantial and competent evidence shall be conclusive. . . ."

The act is a legislative mandate to the superior courts to give credence to the factual findings of an inferior tribunal. It therefore violates Art. IV, § 6, of the state constitution for the reason that only superior courts have original jurisdiction over real property.

### III.

The act violates Art. I, § 3, of the state constitution, which provides:

"No person shall be deprived of life, liberty, or property, without due process of law."

The most elementary requirement of *due process* of law is that the adverse parties have their conflict resolved by an independent tribunal. The tribunal created by the act is neither independent nor impartial. It is an integral part of the board and serves as its right hand. RCW 49.60.250 provides that the chairman of the board (in its role as

prosecutor) shall appoint the tribunal from among the ". . . members of the board or a panel of hearing examiners . . ."

Thus, the board and tribunal are composed of the same members, who function together for a common purpose. The coach of a team is never permitted to appoint as referee one of his players who happens to be on the bench at the moment. Where one party litigant appoints the tribunal, there can be no claim that the adverse party has had his day in court. The board and its self-appointed tribunal do not meet the most elementary requirements of an *independent judiciary*.

## IV.

The act has created an agency with a combination of legislative, administrative, and judicial powers in violation of the constitutional separation of these powers. Its legislative powers are found in RCW 49.60.120, which provides, *inter alia*:

"The board shall have the functions, powers and duties: . . .

"(3) To adopt, promulgate, amend, and rescind· suitable rules and regulations to carry out . . . the *policies* and practices *of the board* . . ." (Italics mine.)

RCW 49.60.120 gives it the power "(4) To *receive, investigate* and *pass* upon complaints . . ." (Italics mine.) The board has exercised the authority conferred upon it by the act to both *prosecute* and *judge* over five hundred complaints filed with· it. The following things were done in the instant case under the *modus operandi* authorized by the specified sections of the act:

The Negroes *complained* to the board that the respondents refused to sell their home to them (RCW 49.60.230). The board *investigated* and *made a finding* in favor of the Negroes (RCW 49.60.240). Upon respondents' refusal to accede to the board's finding, a tribunal was appointed (RCW 49.60.250). It held a hearing and *issued the order* that respondents sell their home to the Negroes (RCW 49.60.250). The respondents *appealed* the order to the

superior court (RCW 49.60.270) to avoid punishment for disobeying the tribunal's order, which is a misdemeanor (RCW 49.60.310).

The superior court reversed the tribunal's order upon the ground that the act authorizing coerced sales of private homes to Negroes is unconstitutional. The board, as the adverse party in the litigation, appealed from the superior court's reversal of the identical order which it itself had issued as a tribunal (RCW 49.60.260(3)).

Thus, the board initiated the case in its role of investigator. As prosecutor, it presented its finding to itself as a tribunal in which role it adjudicated the respondents' property rights by entering an order or judgment that they sell their home to the Negro complainants. When the superior court reversed the tribunal's judgment, it reverted to its role as prosecutor by appealing the superior court's reversal of its own order entered as a tribunal to this court. Pooh Bah of Mikado fame switched roles more tunefully, but not more often than the board does pursuant to the provisions of the act.

The act is unconstitutional because it confers a combination of powers upon the board which the state constitution requires to be separate.

The act erroneously assumes that by merely calling any agency a *tribunal*, it can then function as a court in addition to its other duties even though it lacks all the elements and characteristics which are constitutionally essential to afford due process to parties brought before it.

A casual examination of the act reveals that the committee or tribunal serves as a flying squadron to be called anywhere to bargain on behalf of any disgruntled Negro who has complained against a white man. It is called a *board* in this bargaining state of the proceeding. It designates itself as a *tribunal* in the succeeding coercive stage.

The act provides for this instantaneous transformation in the following sections: RCW 49.60.250 provides that the board render its services free of charge to Negro complainants. RCW 49.60.230 provides how a Negro files his complaint to mobilize the board. RCW 49.60.040 provides

that a Negro is discriminated against if, by purchasing any service or commodity, he was ". . . treated as not welcome, accepted, desired or solicited; . . ." RCW 49.60.240 provides the board will promptly investigate the complaint and, if true, will endeavor to secure a written agreement from the white man not to repeat the offensive act alleged in the complaint.

The board thus bargains for voluntary written surrender of the white man's private constitutional rights. This is made financially attractive to the white man because his surrender at this stage of the proceeding can be made without any cost to him. If he elects to defend his constitutional rights, he must bear his own cost in the ensuing prosecution before the *tribunal* and upon appeal. This is *reputed, in the instant case, to be upwards of ten thousand dollars.* RCW 49.60.250 provides for the tribunal hearing, and the issuance of a formal order by it. RCW 49.60.310 makes disobedience of the order a misdemeanor. If the outcome of the board or tribunal action is not what the Negro wanted, he may have a new hearing before the board, or he may appeal from a tribunal order to the superior court (RCW 49.60.270).

The board and tribunal would be well calculated to achieve the objectives of the act by summarily disposing of individual objections thereto were it not for the fact that a court cannot prosecute a case before itself and a prosecutor cannot be the judge of a case he presents.

The act attempts to create such an unconstitutional combination and caps it all off with a final *coup de grace* to the rights of individuals by RCW 49.60.290, which provides:

"No court of this state shall have jurisdiction to issue any restraining order or temporary or permanent injunction preventing the board from performing any function vested in it by this chapter."

### V.

The coercion of one individual by another in his private affairs is prohibited by Art. I, § 7, of the state constitution. It provides:

"No person shall be disturbed in his private affairs, or his home invaded, without authority of law."

This is a general statement of that complex of liberties encompassed in the expression "The Free World" as currently used in commentaries upon world events.

This constitutional right of the individual not to be dominated in his private affairs is predicated upon the theory that the greatest good for the greatest number can be best achieved by permitting the individual to choose his own course of action, conforming, of course, to the reciprocal rights of others.

". . . In dealings between men, both cannot be free unless each acts *voluntarily*, otherwise one is subjected to the other's will." *Browning v. Slenderella Systems of Seattle*, 54 Wn. (2d) 440, 455, 341 P. (2d) 859.

Until our constitution is amended, we must forego the benefits of regimentation with which other parts of the world are blest.

Thus, a white man may exercise his constitutional right to choose his own course of action in his private affairs by making a voluntary sale of his home in an exclusive district to a Negro. Neighbors cannot disturb him in his private affairs by having him enjoined from doing so. So also, if a white man refuses to sell his home to a Negro, his constitutional right not to be disturbed in his private affairs shields him from coercion on the part of the Negro.

The act, which provides for such coercion, is invalid because it is in irreconcilable conflict with the state constitution.

OTT, J., concurs with MALLERY, J.

ROSELLINI, J. (dissenting)—In approaching the question presented in this case, whether the 1957 amendment to RCW 49.60.030 is a valid exercise of the police power, the majority have not seen fit to set forth the rules which bind the court in examining such a question. These rules, so often repeated and yet apparently not always understood,

were most recently set forth in *Clark v. Dwyer*, 56 Wn. (2d) 425, 353 P. (2d) 941, and are in brief:

The state constitution is not a grant, but a limitation on the law-making power, and the power of the legislature to enact all reasonable laws is unrestrained except where, *either expressly or by fair inference, it is prohibited* by the state and federal constitutions. Where the validity of a statute is assailed, there is a presumption of the constitutionality of the legislative enactment, unless its repugnancy to the constitution clearly appears or is made to appear beyond a reasonable doubt. Where possible, it will be presumed that the legislature has affirmatively determined any special facts requisite to the validity of the enactment, even though no legislative finding of fact appears in the statute. The court must always bear in mind that the legislature, and not the court, is the chosen representative of the people and when it passes a law, it is the voice of the people speaking.

The police power extends not only to the preservation of the public health, safety, and morals, but also to the preservation and promotion of the public welfare. The police power is an attribute of sovereignty, an essential element of the power to govern, and a function that cannot be surrendered. It exists without express declaration, and the only limitation upon it is that it must reasonably tend to correct some evil or promote some interest of the state, and not violate any direct or positive mandate of the constitution.

I think the majority have conceded that there exists an evil with which the legislature is properly concerned and that the law in question was enacted to correct a portion of that evil. They have quoted from the opinion of the trial court a finding that the evil actually exists; so we are not limited to a presumption that the legislature found the evil to exist. We have a finding of fact that it does exist. Without such a finding, we would still be compelled to take judicial notice of the fact that discrimination in housing is one of the major social problems of our day, seriously and adversely affecting the public welfare.

. Without doubt, then, the first requirement for a valid exercise of the police power has been met. Does the law in question reasonably tend to correct that evil? The majority do not deny that it does. There may be disagreement as to whether a law requiring sellers of publicly-assisted housing not to discriminate on the basis of race, creed, or color is the most effective way to attempt to correct or alleviate the problem, or the wisest way, but I think it cannot be gainsaid that, wherever the law is enforced, it does tend in some way to correct the evil. A crack appears in the walls of the ghetto, and the educational process which, we hope, will someday eliminate the evil of discrimination, begins. The second requirement for a valid exercise of the police power has therefore been met also.

But the majority have decided that the law must fall because its violates two direct or positive constitutional mandates—the fourteenth amendment to the federal constitution, which forbids states to deny equal protection of the laws to persons within their jurisdiction, and Art. I, § 12, of the state constitution, which provides:

"No law shall be passed granting to any citizen, class of citizens, or corporation other than municipal, privileges or immunities which upon the same terms shall not equally belong to all citizens, or corporations."

These provisions do not prohibit class legislation. They do require that such legislation must apply alike to all persons within a class, and reasonable ground must exist for making a distinction between those within, and those without, a designated class. Within the limits of these restrictive rules, the legislature has a wide measure of discretion, and its determination, when expressed in statutory enactment, cannot be successfully attacked unless it is manifestly arbitrary, unreasonable, inequitable, and unjust. *Clark v. Dwyer, supra; Faxe v. Grandview*, 48 Wn. (2d) 342, 294 P. (2d) 402; *Bauer v. State*, 7 Wn. (2d) 476, 110 P. (2d) 154. These cases also point out that it is universally held that courts will not look too nicely into

legislative acts to determine whether a reasonable distinction exists.

These are rules which were overlooked by the trial court in its memorandum opinion and have consequently been overlooked by the majority in adopting that opinion as their own. Significantly, moreover, they have overlooked the corollary principle that the legislature, when it chooses to act to correct a given evil, need not correct all of the evil at once, but may proceed step by step. The power of a state to classify objects of legislation may be determined by degrees of evil or exercised in cases where detriment is specially experienced. Numerous cases of the United States supreme court and state courts so holding are cited in 12 Am. Jur. 163, *Constitutional Law* § 485, n. 17. Among them is *Laughney v. Maybury*, 145 Wash. 146, 259 Pac. 17, 54 A. L. R. 393.

Was there in this case no reasonable ground of distinction between sellers of publicly-assisted housing and sellers who have not received such aid? I think it should be manifest that while the practice of discrimination on the basis of race, creed, or color in the sale of any housing is objectionable and harmful to the community, in the case of a sale by one to whom the public (including those discriminated against) has lent its aid in acquiring his ownership, it is particularly odious. Inasmuch as the state itself is not permitted, under the fourteenth amendment, to give any support to discriminatory acts, it seems only logical to me that the legislature, recognizing the great public concern in this matter, should determine that it would not lend its aid indirectly by permitting discrimination by those who offer their publicly-assisted housing for sale.

It is significant that, with the exception of Colorado, all states which have enacted laws prohibiting discrimination in housing (California, Connecticut, Massachusetts, New Jersey, New York, Oregon, Rhode Island, Washington) limited the coverage of the initial enactment to public or publicly-assisted housing. In two of these states, New York and New Jersey, these laws have been upheld against the

charge of unreasonable classification. In the New York case, *New York State Comm. Against Discrimination v. Pelham Hall Apartments, Inc.*, 10 Misc. (2d) 334, 170 N. Y. S. (2d) 750, the opinion states that

" . . . the test is whether or not the classification rests upon some reasonable basis bearing in mind the subject matter and the object of the legislation."

After noting that civil rights and anti-discrimination legislation both in New York and on the federal level have been "a step by step" proposition, the court continued:

" . . . A proceeding step by step by legislative bodies to eliminate the practice of racial discrimination in affairs closely connected with the lives of our citizens is not only a reasonable, but in view of changing times and circumstances, a required method of procedure in the interest of public welfare. The Legislature was authorized to proceed as it did in imposing a ban against discrimination in housing, that is, by gradual steps, beginning with provisions applicable to various classes of publicly owned and managed housing and over a period of time extending the provisions to specified classes of private housing projects inaugurated or carried out with governmental assistance. Proceeding in such manner required classification in the legislation enacted from time to time; and, under the circumstances, reasonable classification was justified. . . ."

In other words, is the legislature acting unreasonably when, in adopting reforms in this emotion-wrapped field involving race relations, it elects to proceed slowly?

In the New Jersey case, *Levitt & Sons, Inc. v. Division Against Discrimination, etc.*, 31 N. J. 514, 158 A. (2d) 177 (appeal dismissed for want of a substantial federal question, 363 U. S. 418, 4 L. Ed. (2d) 1515, 80 S. Ct. 1257) the state supreme court dealt at length with the argument that the New Jersey law against discrimination, by including within its purview only publicly-assisted housing, created an unreasonable and arbitrary classification in violation of the federal and state constitutions. Quoting *Clark v. Paul Gray, Inc.*, 306 U. S. 583, 83 L. Ed. 1001, 59 S. Ct. 744, the unanimous opinion stated that there is a presumption in favor of the constitutionality of a statute and that it will be

upheld unless facts judicially known or proved refute that presumption. The opinion then stated that classification will be sustained unless it causes "invidious discrimination," and next quoted the following passage from a previous decision of the same court (*New Jersey Restaurant Ass'n v. Holderman*, 24 N. J. 295, 131 A. (2d) 773):

" ' . . . It is easily stated that the classification (1) must not be palpably arbitrary or capricious, and (2) must have a rational basis in relation to the specific objective of the legislation. But the second proposition is qualified by limitations which compound the difficulties of one who assails the legislative decision. Thus it is not enough to demonstrate that the legislative objective might be more fully achieved by another, more expansive classification, for the Legislature may recognize degrees of harm and hit the evil where it is most felt. [citing cases] The Legislature may thus limit its action upon a decision to proceed cautiously, step by step, or because of practical exigencies, including administrative convenience and .expense,. . . or because of "some substantial consideration of public policy or convenience or the service of the general welfare." . . . Hence it may "stop short of those cases in which the harm to the few concerned is thought less important than the harm to the public that would ensue if the rule laid down were made mathematically exact." ' "

Applying these rules to the case at bar, the opinion rejected the "unreasonable classification" argument. It said:

"Considering the circumstances which led to the enactment of the statute in question, it becomes apparent that the classification presents no constitutional difficulties. We may note the pressing need for adequate housing for minority groups. Many more in these groups than at present would be in a position to take an active and beneficial role in the cultural, social and economic life of the community were they given an opportunity, and a vital factor in affording this opportunity is access to normal housing accommodations. The portion of the statute in question which relates to housing may be viewed as a means chosen to ease the housing problem facing minority groups. It may be argued that the main purpose is to secure some measure of adequate housing for minorities and only incidentally to this purpose is discrimination proscribed. The desired end may be achieved by legislating in regard only to a

specific kind of housing. And the type of housing chosen is that most easily financed and as to which established patterns would least likely be disturbed. If these goals are not the intent of the Legislature, they do at least serve to demonstrate, insofar as they give a reasonable basis for the statutory classification, that the statute is not invalid on its face or palpably arbitrary. *Cf. Sage Stores Co. v. State of Kansas*, 323 *U. S.* 32, 35, 65 *S. Ct.* 9, 89 *L. Ed.* 25 (1944); *Jamouneau v. Harner*, 16 *N. J.* 500, 519-520 (1954), *certiorari* denied 349 *U. S.* 904, 75 *S. Ct.* 580, 99 *L. Ed.* 1241 (1955); *Reingold v. Harper*, 6 *N. J.* 182, 194 (1951). In the absence of a showing of an actual injury to the plaintiffs, which was not attempted in the proofs, we cannot declare the legislation unconstitutional. Thus, the means chosen by the Legislature to accomplish its goals are not unreasonable, and on that basis we hold that plaintiffs' argument that the Law Against Discrimination incorporates an unconstitutional classification is without merit."

The trial court in the case before this court attempted to distinguish these cases by pointing out that in the New York case, multiple-unit apartment houses were involved, whereas O'Meara was merely selling a private dwelling. No attempt was made to distinguish the New Jersey case which dealt with discrimination in the sale of one-family dwelling units.

I am at a loss to understand, and the majority do not explain, the theory under which they attach significance to the fact that the financing had already been secured when the 1957 law was passed. They say that O'Meara did not voluntarily subject himself to its restraints when he secured his housing. The same would be true of any person who had acquired his property, or entered into a contract for its purchase prior to the effective date of the act if it applied to all housing and not just publicly-financed housing; yet the majority apparently concede that such a law would be valid. The same facts existed in the New Jersey case, but no one saw fit to attach any significance to them. I do not see that they are at all relevant. There is no contention that this is an *ex post facto* law, or retroactive in effect.

Without criticizing the New Jersey case in any way, the

majority dismiss it as "not binding precedent," although they have no hesitation in adopting, without analysis or discussion, the trial court's opinion rendered in this case. That "binding precedent" was criticized at some length in an article which appears in the New York Law Forum, Vol. 6, 1960, p. 38, written by Arnold Forster and Sol Rabkin. I readily recognize that this is not binding precedent either; nevertheless, the author's analysis of the classification problem in this case is so succinct that I will take the liberty of quoting from it. After setting forth the rules which I have referred to above, regarding the heavy burden resting on one assailing a classification, to show that it is arbitrary and without reasonable basis, they say:

" . . . It would appear that the legislature's decision to impose a duty of non-discrimination on those selling housing which they obtained with the aid of the public credit has several very reasonable grounds. It is hardly arbitrary for the legislature in selecting the housing to which it will first apply a ban on discrimination, to impose that requirement of higher community conduct on those receiving public aid. Is not the strengthening of the guarantee of equal treatment implicit in our basic democratic institutions a proper requirement to impose on housing obtained by the use of the public credit? Another reasonable basis for the legislature's selection of publicly assisted housing as the first class to be subjected to a ban on discrimination is that such a ban can be more easily enforced than a ban on other types of housing since the very involvement of a public agency in such transfers makes enforcement of the ban easier in such transactions. Furthermore, the sanction of possible delay or suspension of the public mortgage insurance is available as a potential additional enforcing device.

"It is clear that there are not one, but several, completely reasonable bases for the legislative classification involved in statutes barring discrimination in publicly assisted housing and that, therefore, any effort to strike down such statutes as improper legislative classifications is improper."

The trial court seems to have been disturbed by the nature of this legislation, which imposes a limitation on an owner of real property who decides to sell it. The court

makes frequent reference to the concept of "freedom of contract." But that property rights are held and must be used subject to reasonable regulations under the police power is so well established that citations of authority are unnecessary. The trial court and the majority have implicitly recognized that it is not enough to show that an incident of property ownership has been restricted in order to successfully challenge the constitutionality of an act.

The freedoms protected by positive mandate of the constitution are those contained in the first amendment to the federal constitution, and Art. I, §§ 4, 5, and 11 of the state constitution. These are the freedom of religion, speech, press, and assembly. In *Nostrand v. Balmer*, 53 Wn. (2d) 460, 335 P. (2d) 10, this court exercised the most extreme judicial restraint in upholding a law attacked as an interference with two of those freedoms, searching diligently through all manner of evidence (reliable and not so reliable) to find some facts which would justify its enactment. Now, confronted with an act which does not abridge any of these expressly-protected freedoms, but merely imposes a limitation on the disposition of one's property, which is clearly reasonable and unoppressive, the majority eagerly and peremptorily strike it down. To my mind, the respondent has failed to sustain the burden of demonstrating the invalidity of the act; and the decision of the majority is an arbitrary interference with the will of the people expressed unequivocally through legislation.

I would reverse.

FINLEY, C. J., HILL, and HUNTER, JJ., concur with ROSELLINI, J.

HILL, J. (dissenting)—I have signed Judge Rosellini's dissent, but feel impelled to encumber the record with a brief expression of my own views.

The trial court's memorandum opinion, quoted and approved by the majority, states clearly the harmful effects of segregated housing. Segregated housing, of course, is due to a multiplicity of causes; however, the discrimination,

which prevents those who have the desire and the means to acquire housing outside the segregated area, is an important contributing factor to its spread and its perpetuation. A great public need exists to end this discrimination.

I am convinced that the police power, the least limitable of the powers of government, already so extensively used to subordinate the rights of property ownership and of contract where they conflict with the public interest[1], can be properly exercised to meet that need. I do not think its exercise requires the crutch of publicly-assisted housing. The prohibition should be directed against discrimination, and not against discrimination by some particular group based on their method of financing.

By signing Judge Rosellini's dissent, I have indicated that I agree that the particular classification used by the legislature can be justified, but that does not mean that its wisdom is not open to serious question.

---

November 21, 1961. Petition for rehearing denied.

---

[1]Zoning ordinances; height of buildings; methods of construction; character of materials, etc.